THE STATE v. HOWARD, *Appellant.*

Division Two, November 21, 1893.

1. **Criminal Practice: LIST OF JURORS: EXCEPTIONS:** The objection that the defendant in a criminal trial was not furnished, at the time required by the statute, with a list of the persons from which the trial panel was to be taken was waived by the failure to make timely objections and to save exceptions thereto.

2. ——: **INCOMPETENCY OF JURORS: WAIVER:** Timely objection must be made and proper exceptions saved to the incompetency of a juror because of his nonresidence in the county and state for the time required by law, where such fact is brought out on the juror's *voir dire* examination.

| | |
|---|---|
| 118 | 127 |
| 118 | 163 |
| 118 | 127 |
| 121 | 553 |
| 118 | 127 |
| 131 | 393 |
| 118 | 127 |
| 132 | 197 |
| 132 | 359 |
| 134 | 138 |
| 134 | 158 |
| 118 | 127 |
| 141 | 337 |
| 141 | 637 |
| 118 | 127 |
| 148 | 239 |
| 118 | 127 |
| 154 | 126 |
| 118 | 127 |
| 157 | 183 |
| 85a | 27 |
| 118 | 127 |
| 166 | 204 |

The State v. Howard.

3. ——: JUROR: INSANITY: PRESUMPTION. Where it does not appear that the insanity of a person selected as a juror was of a permanent or fixed character, its continuance will not be presumed, especially in the face of countervailing evidence.

4. ——: PREJUDICE OF JUROR: NEW TRIAL: AFFIDAVITS. The affidavit of a defendant on motion for new trial, as to prejudgment by a juror, must be supported by the affidavit of his counsel.

5. ——: ——: ——: ——. The refusal by the trial court of a new trial because of prejudgment by jurors will not be disturbed, where there are affidavits *pro* and *con* on such question.

6. ——: MISCONDUCT OF ATTORNEY: WAIVER. Objection for misconduct of an attorney, in assisting the prosecution, after having been appointed defendant's counsel by the court at a previous term, should be made in the trial court.

7. ——: ATTORNEY: HARMLESS ERROR. Where such attorney neither appeared nor prepared papers for the defense and did not advise with him as to the merits and was excused from service as his counsel, the fact that he subsequently assisted in the prosecution affords no ground for reversing the judgment.

8. Criminal Law: MURDER IN FIRST DEGREE: EVIDENCE: VERDICT. The evidence reviewed and *held* to support a conviction of murder in the first degree.

9. ——: EVIDENCE: IDENTITY. On a question of identity witnesses may swear to their belief that the person or thing is the same.

10. ——: ——: ——. Where in such case the witness testifies that "he resembles him," the testimony should go to the jury, and its sufficiency is exclusively for its determination.

11. ——: ——: DEPOSITIONS. Testimony taken by depositions is, in point of law, of a secondary nature to, and weaker in, force and effect than testimony delivered *ore tenus,* where the witnesses are subjected to the ordeal of cross-examination.

12. ——: MUTE: IDIOT. A person deaf and dumb from birth, it seems, is not presumed in the modern law to be an idiot.

13. Criminal Practice: MUTE: IDIOT: EVIDENCE. A trial court may elicit testimony from a deaf and dumb witness by any means necessary to that end.

14: ——: MURDER IN FIRST DEGREE: VERDICT: INSTRUCTIONS. Where the evidence shows that defendant is either wholly innocent or is guilty of murder in the first degree, it is not error to instruct the jury that if they found him guilty they had nothing to do with assessing his punishment.

15. ———: IMPROPER CONDUCT OF ATTORNEY, REMEDY FOR. Improper conduct of an attorney for the state in holding pictures of the defendant in sight of some of the jurors is cured by the court sustaining an objection by defendant's counsel and rebuking the attorney.

16. ———: IMPROPER REMARKS OF ATTORNEY. That an attorney went outside of the record in his closing address cannot be shown on appeal by affidavits; but the attention of the trial court should be called to the conduct complained of, and the proper remedy demanded, and, if not granted, an exception should be saved.

*Appeal from Laclede Circuit Court.*—HON. C. C. BLAND, Judge.

AFFIRMED.

*Holt & Holt* for appellant.

The errors complained of by defendant are: *First*. Admitting illegal and irrelevant testimony on the part of the state, especially the incompetent testimony of Ed. Hoard. *Second*. Defendant did not have forty-eight hours to challenge the jury as shown by the record, only having forty-two hours, when he was forced into trial. *Third*. Giving the instructions to the jury for the state, and in particular the following instruction: "If you find the defendant guilty, you will simply so say in your verdict. With the punishment you have nothing to do. The duty of assessing the punishment to be inflicted upon the defendant is a matter of law devolving upon the court." The court has no right to intercede in behalf of the state so far as to ask a verdict from the jury on the grounds that they will be released from all responsibility. *Fourth*. Permitting the state's attorney to cross-examine the defendant in relation to matters to which he did not testify in chief, as shown by defendant's objections in the evidence. *State v. Porter*, 75 Mo. 171; *State v. McLaughlin*, 76 Mo. 320; *State v. Turner*, 76 Mo. 350. *Fifth*. Misconduct of W. M. Barr, attorney for the state, by attempting to and showing part of the jury, a double picture of defendant in prison garb which was

not in evidence, also in going outside of the record in his closing argument. *Sixth*. Misconduct of prosecuting attorney Newhouse in assisting in the prosecution of the case. J. L. Newhouse had, at one time, been appointed by the court to represent the defendant, and did counsel and assist defendant in his defense, and that said Newhouse was afterwards elected prosecuting attorney and assisted in prosecuting defendant, and his affidavit, as appears by record, does not deny appearing on both sides of the case, and only offers as an excuse that he has no recollection of counseling and advising with defendant on the merits of his case. *Loyd v. Railroad*, 53 Mo. 509; *State v. Kring*, 64 Mo. 591; *State v. Lee*, 66 Mo. 165; *State v. Reed*, 71 Mo. 200. *Seventh*. Not excluding evidence of defendant's incarceration in the San Quentin penitentiary, California. Admitting evidence of an attempt at jail breaking. Improper evidence as to other matters and crimes offered by the state in a criminal case must be excluded by the court whether proper objections are made for the defendant or not. *State v. O'Connor*, 65 Mo. 374; *State v. Tabor*, 95 Mo. 585. *Eighth*. Refusing to set aside the verdict of the jury; for the evidence, as disclosed by the entire record, was insufficient to justify or support the verdict. *State v. Howell*, 100 Mo. 628. *Ninth*. Defendant was not furnished a panel of forty jurors from which to select, as shown by objections thereto and uncontradicted affidavit of defendant. One Jonathan Williams had been in the county and state less than sixty days. *State v. Waters*, 62 Mo. 196; *State v. Pagels*, 92 Mo. 300. *Tenth*. One of the jurors, Thomas B. Cotton, was incompetent to serve, as he was insane, as shown by the certified copies of the records of the county court of Laclede county. Insanity once proven is presumed to continue when not contradicted by expert testimony. *State v.*

*Lowe,* 93 Mo. 570; *State v. Meyers,* 99 Mo. 107. *Eleventh.* At the empaneling of the jury, none of them disclosed the fact that they had expressed an opinion, and one John Gallion had prejudged the case and fails to satisfactorily explain or deny it. Jurors should be wholly unexceptional, and the test to judge their fitness and competency is on their *voir dire,* but if they do not answer the truth and disclose their disabilities, the prisoner is not to be deprived of his rights when he subsequently discovers the objection. *State v. Burnside,* 37 Mo. 343; *State v. Wyatt,* 50 Mo. 309; *State v. Taylor,* 64 Mo. 359.

*R. F. Walker,* Attorney General, *Morton Jourdan,* Assistant Attorney General, for the state.

(1) No error was committed in admitting the testimony of Ed. Hoard and his wife. Although deaf and dumb, they were competent to testify, and it was proper for the court to use an interpreter in their examination. Revised Statutes, 1889, sec. 8402. (2) Appellant's complaint that he was not allowed the forty-eight hours in which to challenge the jury was made for the first time in the motion for a new trial, and hence came too late. *State v. Foster,* 115 Mo. 448; *State v. Elvins,* 101 Mo. 243; *State v. Carter,* 98 Mo. 176; *State v. Jewell,* 90 Mo. 467; *State v. Bulling,* 105 Mo. 204; *State v. Hultz,* 106 Mo. 41; *State v. McDaniel,* 94 Mo. 301. (3) No error was committed in the cross-examination of defendant, because it was confined to matters about which he had testified in chief. *State v. Adams,* 109 Mo. 208; *State v. Beaucleigh,* 92 Mo. 495; *State v. Houx,* 109 Mo. 654. (4) Whatever was the misconduct upon the part of Barr, counsel for the state, in exhibiting to the jury a picture of defendant in his prison garb, was cured by the trial court, who very promptly, in the presence of the jury, reprimanded and

rebuked the attorney. *State v. Dusenberry*, 112 Mo. 277. The argument of Barr, complained of, was entirely legitimate and legal. He had a perfect right to discuss all questions in evidence, and draw his own conclusions in his own language. *State v. Brooks*, 92 Mo. 542; *State v. Jackson*, 95 Mo. 623; *State v. Anderson*, 89 Mo. 312. (5) The affidavit of J. L. Newhouse, a former counsel for defendant, but subsequently one of the attorneys for the prosecution, is to the effect that he did not at any time counsel or advise with defendant as to the merits of his case. (6) The evidence of the incarceration of the defendant in the San Quentin penitentiary was clearly admissible for the purpose of impeaching his credibility as a witness. The testimony of his attempt to break jail while incarcerated and awaiting trial for the crime in the case at bar, was also admissible; it tended to overcome the legal presumption of innocence attending the defendant, and also to establish his guilt. *State v. Howell*, 117 Mo. 307; *State v. Moore*, 101 Mo. 316; *State v. Jackson*, 95 Mo. 623; *State v. Mallon*, 75 Mo. 355. Any conduct on the part of an accused indicating a consciousness of guilt is legitimate evidence. *State v. Moore*, *supra; State v. Howell, supra; Clark v. State*, 8 Crim. Law Mag. 19; *People v. Petmecky*, 2 N. Y. Crim. Rep. 450. (7) The facts in this case, as developed by the testimony, present one of the strongest cases of circumstantial evidence possible. *State v. Jackson*, 106 Mo. 181; *State v. Orrick*, 106 Mo. 111; *State v. Lowe*, 93 Mo. 547; *State v. Hicks*, 92 Mo. 432; *State v. Hammond*, 77 Mo. 158; *State v. Gann*, 72 Mo. 374; *State v. Musick*, 71 Mo. 401. Upon the *voir dire* examination juror Cotton was accepted by both the state and defendant. The fact that he may at some time prior have been adjudged insane did not render him incompetent as a juror. Insanity once established is not

presumed to continue, and unless it affirmatively appears that at the time he qualified as a juror he was insane, he was not disqualified by reason of his former condition. *Baxter v. People*, 3 Gil. (Ill.) 368; Browne's Medical Jurisprudence on Insanity [2 Ed.], sec. 322; *State v. Hogshead*, 6 Hump. (Tenn.) 59.

SHERWOOD, J.—Convicted of murder in the first degree by shooting Thomas McMichael, a deaf and dumb mute, to death with a revolving pistol, the defendant has appealed to this court. Associated with him in the indictment as accessories were William Jennings, James Coldiron, A. L. Martin, Jr., and William Martin.

The murder is charged to have occurred on the twenty-seventh of April, 1889, in Maries county, Missouri, and a change of venue, at defendant's instance, was awarded to Laclede county. Various errors have been assigned in the briefs of counsel as grounds for a reversal of the judgment; these will be examined, and, when necessary, a sufficient portion of the evidence will be set forth in outline showing the application of the rulings made.

I. And, first, as to the list of those from whom the jurors were to be drawn not being furnished to the defendant forty-eight hours before the trial began. In the bill of exceptions the examination of the forty from which the trial jurors were to be drawn is not preserved, nor does it appear that defendant made any objection or saved any exception because of the failure to furnish him the list at the time required by law. This failure, if it be a fact, would be waived by neglecting to make timely objection, and to save the point in the bill of exceptions. *State v. DeMosse*, 98 Mo. 340; *State v. Foster*, 115 Mo. 448.

II. The motion for a new trial recites, and also

the brief of counsel, that Jonathan Williams was on the list of forty, and was incompetent as a juror, because at the time of the trial he had been "a resident of the county and state less than sixty days." The names of those who composed the forty are not preserved; but if they were, and the fact was as is claimed, then, when the fact was brought out on the *voir dire* examination, timely objection should have been made to Williams' name being retained on the list, and, if such objection failed, then the matter should have been preserved in the bill of exceptions, the only repository of such objections and exceptions as occur during the progress of the trial. It is, indeed, stated in defendant's affidavit in support of the motion "that defendant's counsel challenged and objected to said juryman;" but if they did, the objection, in order to its ultimate validity, should have been saved as aforesaid, since neither recitals in the motion nor yet in the affidavit are any evidence whatever of what occurred during the trial and in the presence of the court, as we have time and again decided.

III. Other objections are to the competency of three of those who composed the trial panel, to-wit: Thos. B. Cotton, John Gallion and Ira B. Hurd.

*First.* Thos. B. Cotton is alleged to have been insane at the time of the trial, and the affidavits of defendant and his counsel state that they were not aware of this fact at that time. The county court records of Laclede county also show that said Cotton was insane, and that his insanity was of less than one year's duration, and thereupon he was adjudged insane by that court on the twenty-eight day of April, 1884, and sent to the asylum at Fulton for treatment; and further, the records of that court do not show that Cotton had been discharged from the asylum. It is true that after a person has been adjudged insane, such

insanity is presumed to continue. *State v. Lowe*, 93 Mo. 547, and cases cited. In *Lowe's case*, at the time the homicidal act occurred, December 31, 1881, the insanity was shown to have existed for some nineteen years, resultant from being thrown from a mare in 1862; an insanity which had exhibited itself almost continuously ever since its inception. In the present instance it does not appear whether the insanity was of a permanent, habitual or chronic character, nor by what caused; the only statement in the record is that it "was of less than one year's duration." It may have been only of a temporary or spasmodic nature, and, perhaps, easily cured. At any rate, Cotton is found back in his county, and resides there for years and is regarded by his neighbors as entirely sane for several years past, as shown by the affidavits of those neighbors.

Where the insanity has been only temporary and the time of its exhibition remote, it may be rejected by the court as not warranting, in the absence of countervailing evidence, a presumption of continuance. 2 Bishop's Criminal Procedure, sec. 674. If no habitual insanity be shown at a certain period, insanity which is "continuous and chronic," the existence of such lunacy does not even shift the burden on the party asserting competency. 1 Wharton & Stilles' Medical Jurisprudence, sec. 61.

As there is nothing before us to show that the insanity of Cotton was of a permanent and fixed type or nature, we will not assume that it was, especially in the face of the countervailing evidence of his neighbors. And these further considerations greatly strengthen this view.

It will be presumed that the authorities at Fulton did their duty, and did not discharge an insane person committed to their care. It will also be presumed that,

if Cotton had escaped and returned to his home county, those authorities would have complied with their duty and the law, by notifying the sheriff of that county forthwith to apprehend him and bring him back. Revised Statutes, 1879, section 4148. Taking all these matters into consideration, as well as the action of his honor, Judge Bland, who must have observed Cotton's demeanor pending the trial, and who denied the motion for a new trial, we are fully warranted in presuming that Cotton's insanity was but temporary and that he was a sane man at the time of his selection as a juror. To deny this position would be to fly in the face of presumptions most reasonable and natural and the daily experience of common life.

*Second.* Now as to jurors Hurd and Gallion and the objections urged against them; such objections can be answered in two ways: In the first place, it does not appear only in the affidavit of *defendant* that he was not aware of the existence of prejudgment on the part of those jurors at the time of their selection. *Non constat* but that his counsel was fully aware of such disqualifying fact, since no intendments are entertained in favor of objections of this sort; nor are they favored by the courts. The rule is that any such objection to a juror must be supported as well by the affidavit of *counsel* as of *client*; nothing less than this suffices. *State v. Burns*, 85 Mo. 47; 1 Thompson on Trials, section 116; Thompson & Merriam on Juries, sections 275, 302.

*Third.* In the second place, the circuit judge possessed far better opportunities than we of determining the very right of the matter here at issue, and as there were affidavits *pro* and *con* on this point; as the trial judge was doubtless acquainted with each of the affiants; as every lawyer knows how easily affidavits impeaching the impartiality of jurors are procured, and

when the dangerous consequences which would result from lending too facile an ear to post-trial complaints of this sort are considered, we feel no inclination to hold otherwise on this point than did the trial court.

IV. It is asserted that J. L. Newhouse was appointed at a former term of the court to defend defendant, and at the trial term advised and assisted counsel for the prosecution. Speaking generally, this, if true, was reprehensible conduct, and this, notwithstanding his subsequent election as prosecuting attorney; but if known, as this fact must have been, to the defendant, he sat by and failed to bring the matter to the attention of his counsel and of the lower court, he could not thus speculate on his chances of an acquittal, and keep the point now presented in reserve to be sprung in the event of conviction. Besides, the uncontradicted affidavit of Newhouse shows that though nominally appointed at a former term as one of defendant's counsel; yet he prepared no papers in the cause; did not advise with defendant as to the merits of the cause; and was excused from further service in that capacity, and never appeared in the cause; these facts furnish no ground for a reversal, since it does not appear that Newhouse, while thus nominally appointed, obtained such knowledge of any facts which it would be prejudicial to his former client to communicate. *Johnson v. Marriott*, 2 Cromp. & M. 183; Weeks on Attorneys, secs. 271, 120; 1 American and English Encyclopedia of Law, 960 *et seq.* This distinction between the nominal employment of an attorney and the employment of one who fully enters into and obtains the confidence and secrets of his client, is clearly pointed out in the authorities.

V. The contention concerning the insufficiency of the evidence to support the verdict, and that the verdict is against the evidence, will now be considered.

The murder in question was perpetrated at a point in Maries county, three and one-half miles northeast of Dixon, a village on the Frisco railroad. On the evening of April 26, 1889, about sundown, the defendant called at the residence of Briggs and inquired the way to Jim West's, who lived about three miles to the east of Briggs' house. Having received this information, defendant proceeded in the direction indicated. Hoard lived about a mile from where West lived, and McMichael lived with Hoard. Duncan lived about a quarter of a mile to the east of Briggs and something over two miles west from West's, and Hoard lived about one and three-quarters miles from Duncan, also to the east. "Along late in the evening" of the same day defendant called at Duncan's and inquired the way to West's store, and being asked by Duncan what his name was, said "Brockman." Obtaining the direction, defendant proceeded in the direction of West's store. That night about nine o'clock defendant stopped at Martin's and stayed all night. Martin lived still further eastward and not quite two miles from West's store, and on the same road defendant had come. While there the defendant said he was from about Springfield, and claimed to be in search of an uncle of his by the name of Bolin, who he said was a renter on the Gasconade river, a stream not a great ways off, and he was directed where to make inquiries and to take the county road *due north*. Defendant had a large revolver in a belt. After an early breakfast, he departed, and was thereafter seen the same morning by Martin and his wife at West's store, where they spoke to him again. Wm. Martin, at whose house defendant stayed, was a co-indictee with the defendant. Andrew Martin, the father, lived at the same house.

Mrs. Duncan lived west of Hoard's something between a quarter and three-quarters of a mile and

was at her house on the same morning, the twenty-seventh of April and between eight and nine o'clock, when defendant came by and inquired the way to "McMichael's, the deaf and dumb man." He was shown the way, but went around the field the way he came.

On the same morning, something in the neighborhood of nine o'clock, Peterson was clerking at West's store, [about three-fourths of a mile from Hoard's, where McMichael stayed. Defendant came to the store, stayed fifteen or twenty minutes, and asked where "the deaf and dumb people lived," and was given the proper directions. The Hoards, husband and wife, and McMichael were known and commonly called in that locality as defendant designated them. On the evening of that day defendant called at Hoard's at six o'clock and ate supper. He was heavily armed with pistols; said his name was "W. F. Buckner;" that he was a detective and an investor and that he had come to arrest "Tom" (McMichael) for robbing a widow at Bluff, Osage county; that if Tom was not the right man he would send him back. "Tom" was pale and nervous and did not want to go till daylight, but defendant took him by the arm, pointed a pistol at his head and compelled him to go. This was about nine o'clock. Defendant also took two pistols of Tom's at the time and put them in his coat pocket. Tom had on his person that evening the sum of $45.

Judge Smith lived south of Hoard's a little less than one-half a mile. On that same Saturday evening, April 27, 1889, he stepped out of his house at about nine o'clock and heard hallooing in the direction of Hoard's, which was repeated "a time or two" as he stood listening some few minutes, when he heard two reports of firearms. These reports came from the west.

On the next morning, Sunday, April 28, Tom McMichael was reported missing; the neighborhood was aroused, search was made and his dead body was found on the next Tuesday, April 30, one mile west from Smith's and in the same direction that the reports of firearms were heard the preceding Saturday night. There were two gunshot wounds on the person of deceased, one through the head and one through the body, which lay in the woods some sixty yards from the county road.

The vest of the deceased was cut open and there were no valuables found on his person. The deceased lay on his back, his coat was folded under his head and his hat placed over his eyes. Around the body were evident signs of a struggle as well as blood, and a few steps from the body were found a long red pocketbook, a railroad guide and envelope and several other papers, etc., and especially a piece of poetry in manuscript. These were abundantly identified as being the property of the defendant and as having been seen in his possession at Cordell's, two miles from West Plains, in Howell county, where he took special delight in reading and laughing at the poetry, a few days before the occurence of the murder. The foregoing incidents and concomitant circumstances so entwine themselves around the defendant and link him to the murderous deed as to leave no reasonable hypothesis but that of his guilt. It is true that some of the witnesses identify defendant with more confidence than others, some asserting his identity with similar emphasis to that employed by the prophet Nathan at the close of the ewe lamb parable; this is especially true of the deaf mutes, Mr. and Mrs. Hoard, from whose dwelling Tom McMichael was taken on that fatal Saturday night. The same varying degrees of confidence were displayed as to the identity of the articles found near the

body of the deceased at the scene of the murder. some of the witnesses distinctly identifying the piece of poetry and other papers while speaking more guardedly as to the pocketbook and some of the other supposed contents of the pocketbook.

This evidence was amply sufficient to identify the articles in question inclusive of the pocketbook and the same may be said as to the identity of the defendant.

It is not necessary to the identity of persons, or of handwriting, or of other things, that the identifying witness should swear pointedly to such identity; it is sufficient that the witness swear to his belief that the person or thing is the same. A jury will be authorized to return a verdict of guilty although the witness will not swear positively to the identity of the prisoner with the guilty party; if the witness swears "he resembles him," the testimony should go to the jury, and its sufficiency is exclusively for their determination; its competency is beyond question. *State v. Babb*, 76 Mo. *loc. cit.* 504, 505.

The defendant admits, when testifying, that he was at Cordell's some three weeks, stopping there about the first of April, 1889, and remaining there till the afternoon of April 25, when he left on the afternoon train for Nichols Junction, arriving there on the twenty-sixth, took the train for St. Louis, and that night took the train for Louisville, Kentucky, arriving there on the twenty-seventh of April. He admits what is stated by other witnesses, that Wm. Jennings was at Cordell's, and he states that Jennings had a long red pocketbook and a piece of poetry in it similar to the one found with the dead body and shown to him at the trial, and that Jennings' eyes being sore he requested defendant to read it to him, which defendant did. The Cordells, however, deny the statement of defendant that either

the pocketbook or the poetry was in Jennings' posses-
sion while defendant was at Cordell's, one of the Cor-
dells identifying positively the piece of manuscript
poetry afterwards found by the dead body as being the
same defendant had read and laughed over while at his
father's, near West Plains. The same witness also
speaks of defendant wearing a large Smith & Wesson's
revolver in a belt, a fact also testified to by witnesses
in the vicinity of the murder.

Defendant's testimony as to being in Louisville,
Kentucky, on the twenty-seventh of April, 1889, and
for weeks thereafter in different parts of the same state,
the depositions of several witnesses taken in that state
fully sustain.

The reputation of two of the Louisville witnesses
as to defendant being in that city on the twenty-seventh
of April, is shown by a witness from Kentucky to have
been bad. In addition to that, two witnesses swear to
having seen defendant at Eureka Springs on May 3,
1889; and the testimony of defendant as to being at
and near West Plains in April is contradicted by his
repeated declarations to Tom Imboden when he was
brought back from San Quentin, California (where it
seems he was in the penitentiary) to the effect that he
had not been in Missouri since 1886. All these matters
of conflicting testimony were subjects for and within
the exclusive province of the jury to decide, and their
determination must be regarded as final. *State .v.
Breeden*, 58 Mo. 507; *State v. Thomas*, 78 Mo. 327;
*State v. Moxley*, 115 Mo. 644; *State v. Orrick*,
106 Mo. 111; *State v. Cantlin, ante*, p. 100. This
is the case, unless material and prejudical errors
have been committed against defendant, occurring in
the admission .or the exclusion of evidence, or the
giving or refusing of instructions or authorities—matters
to be presently noticed. But in this connection it is

not improper to say in regard to the depositions taken in behalf of defendant, that testimony taken in this way is regarded in point of law of a secondary nature to *viva voce* testimony where witnesses are subjected to the ordeal of cross-examination, and such depositions are inferior and weaker in point of force and effect ₁to testimony delivered *ore tenus*. And the obvious reason given is that a witness will frequently depose that in private which he would be ashamed to certify before a public tribunal. . Starkie on Evidence [9 Ed.], 766.

VI. Looking, then, to one of the matters just suggested in the next preceding paragraph, was prejudicial error committed against the defendant in admitting or excluding evidence,—a topic now to be examined.

*First.* Objection was made to the admission of the testimony of Ed. Hoard on the grounds that "he could neither read nor write, and had no knowledge of any language." This objection was well founded, so far as concerns *articulate sounds*; but the intelligence of Hoard was amply displayed in his narration of the circumstances which occured at his house on the night of the twenty-seventh of April. It does not appear in the record in this case, how the testimony of this witness was delivered, whether by signs and an interpreter or by writing.

Our statute, section 8402, contains nothing on the subject of deaf mutes; but doubtless a court has the inherent power to elicit testimony from such a witness by whatsoever means necessary to the end to be attained. The presumption that a person deaf and dumb from birth should be deemed an idiot, does not seem to obtain in modern practice, at least in the United States; and if it did, the circumstances of this case forbid its application. Such unfortunate persons may be witnesses, if able to communicate their ideas

by signs through the medium of an interpreter, or by writing, if they write and read writing. And even if the witness can write, this does not prevent his testimony from being communicated by signs; either way may be adopted. 5 American and English Encyclopedia of Law, 119, and cases cited.

*Second.* As to Mrs. Hoard, no objection was made to her as a witness, and she was competent for reasons similar to those already stated.

*Third.* Relative to the alleged introduction of testimony showing that defendant was imprisoned in the penitentiary at San Quentin, California, it appears that this testimony was excluded by the court at the instance of defendant. But at any rate, if afterwards admitted, it was competent testimony, because defendant testified as a witness, and such testimony as that offered was competent as an attack on his moral character, and therefore admissible. *State v. Miller,* 100 Mo. 606.

*Fourth.* Likewise testimony of an attempt on the part of defendant to break jail was also admissible. *State v. Jackson,* 95 Mo. 623; *State v. Moore,* 101 Mo. 316; *State v. Howell,* 117 Mo. 307.

*Fifth.* The questions asked defendant on his cross-examination were germane to the matters referred to in his examination in chief. He had testified regarding persons, dates and places and it was legitimate to cross-examine him respecting these matters. And if it were not, the evidence of defendant's guilt is so overwhelming and the improbability of any material injury resulting to defendant from the cross-examination, that no reversal should occur on that ground alone.

VII. *First.* The statute affixes the punishment of death to the crime of murder in the first degree. Unless wholly innocent, the defendant was guilty of that crime; this being the case it was proper to tell

the jury that if they found the defendant guilty they had nothing to do with assessing his punishment, and this was a matter of law devolving on the court; such instructions have frequently received the sanction of this court. *State v. Avery*, 113 Mo. *loc. cit.* 501.

*Second.* As to the other instructions on behalf of the state, no special complaint has been made respecting them. It is quite unnecessary to discuss them. They pursue approved forms, and those given at the instance of defendant certainly left nothing to be desired on his part.

VIII. But one point remains to be discussed, and that is the alleged improper conduct of Mr. Barr, one of the counsel for the prosecution, in two particulars, which will now receive attention.

*First.* It appears from the bill of exceptions that Mr. Barr during the progress of the trial had some pictures of defendant in his hand, in sight of some of the jury. On this being discovered by opposing counsel, and objection made, the court promptly sustained the objection and rebuked the attorney.

This action of the court neutralized any bad effect which the sight of the pictures might have had on the jury, as this court has ruled in a similar case. *State v. Dusenberry*, 112 Mo. 277. At any rate, we would not feel authorized to reverse the judgment on such a ground; and, besides, the attorney, as is claimed, in handling the exhibits in the cause, may have unintentionally let some of the jury catch sight of the pictures in question. But his affidavit is no evidence of this.

*Second.* And in regard to other affidavits asserting that one of the same attorneys went outside of the record in his closing address to the jury, it is sufficient to say what this court has always said that such affidavits afford no basis for ascertaining what occurred

VOL. 118—10

during the trial and in the presence of the court. *State v. Hayes*, 81 Mo. *loc. cit.* 576, 577.

The proper course to pursue, if such improper conduct occurred, was to have called the attention of the court to the matter and demand that the proper remedy be applied, and, if it were not, to have saved an exception. This is the only course which, in such circumstances, can be pursued, since matters of exception, which this was, stand on the same footing in criminal as in civil cases, and can only be saved by the like means in the one as in the other. *State v. Foster*, 115 Mo. 448, and cases cited.

In conclusion, this cause has been fairly and carefully tried, and on reading the record, the conclusion seems beyond reasonable doubt that the verdict rendered was the only one which, considering the whole evidence, the jury would have been justified in rendering. That evidence discloses a most heinous, unprovoked and atrocious murder; the murder of a deaf and dumb mute for the mere purpose of pecuniary gain. Having patiently weighed all the points in the case, and finding no error in the record, we affirm the judgment and direct that the sentence pronounced be executed. All concur.