## Commonwealth v. Clark

*Ephraim Lipschutz,* assistant district attorney, for Commonwealth.

*Robert N. C. Nix,* for defendant.

SLOANE, J., December 1, 1944. — Defendant was found guilty of assault and battery with intent to ravish (but not guilty of rape) upon a 25-year-old deafmute who has been so since birth; she could neither read nor write and, what is more, she had no knowledge of a recognized or standard sign language. Defendant asks for a new trial. It is submitted on his behalf that prosecutrix did not take the required oath and that her testimony should not have been received.

An attorney, Mr. Olanoff, who has worked with deaf and dumb people for many years, and has a knowledge of sign language, was sworn to act as interpreter. Prosecutrix's father, who claimed he could converse with her through signs, was sworn as an additional or alternative interpreter but, except for one or two questions, was not used.

The interpreter said that though prosecutrix did not know standard sign language, with the exception of one or two signs, she did make motions that were familiar and understandable to him and to a degree

understandable to anyone. He admitted that in interpreting the motions of the witness he would be interpreting that which is not standard to the sign language.

The oath was administered by the interpreter, and he claimed he made it understandable to the witness and her reply he vouched was that she would tell the truth. At trial no argument was made that prosecutrix is of deficient mental capacity [1] and does not comprehend the nature of an oath, even though the interpreter is able to convey the question to her and receive the answer. But defendant did object that it did not clearly appear that she understood the question and had, therefore, actually been sworn.

The interrogation of the witness was allowed to proceed with the aid of the interpreter. Through him she testified that she was alone in a room upstairs in her home; that defendant, a soldier, came into this room, greeted her and put something on the table. He then put her arms back of her, shoved her chin back, laid her down on the bed and spread her and had carnal intercourse. From her motions there was strong suggestion and inference of force having been used and lack of consent on her part though questions as to these matters were not asked directly. The cross-examination was short. There were two questions: her age and the date. The interpreter was not able to convey these to her and receive an answer which he understood. Her father tried also and did not get answers.

There was corroborating evidence of the occurrence by the grandmother of prosecutrix, an aunt of defendant. She said that on the day in question, while defendant was visiting her home where prosecutrix also lived, he asked for permission to go to the bathroom on the second floor; that he was given this permission

---

[1] In his brief, counsel for defendant makes the statement for the first time that prosecutrix is of subnormal mentality and that she had for a number of years attended a school for the deaf. These matters do not appear in the record. See Commonwealth v. Kosh, 305 Pa. 146, 154 (1931).

and went upstairs and was gone about 10 minutes. She heard no noise or disturbance during that time. Soon after defendant left, she heard noises at the head of the stairs and, upon looking up, saw her granddaughter standing there with the front of her dress bloody. She went to her, picked up her dress and examined her private parts, and found blood running down her clothes to her shoes. She said prosecutrix was "crying and carrying on something terrible".

The mother of prosecutrix was not at home at the time of the occurrence but came home soon afterwards. She produced the clothing worn by prosecutrix on that day and the bedspread; the condition of both were corroborative of the testimony about the bleeding.

A physician testified that he examined prosecutrix that day, about two hours after the alleged attack; that he found quite a bit of clotted blood in the region of the genitalia, and that she had a continuous trickle of blood from the vagina. He could not say that intercourse had caused the condition or whether the hymen was intact; and he did not notice any inflammation at the time of his examination. He said he did not examine closely after he saw prosecutrix was bleeding, saying, "I thought she would perhaps have a better detailed examination at the hospital".

Defendant did not take the stand. Defendant's counsel demurred to the evidence and, when he was overruled, requested binding instructions, offering points for charge which were refused.

Prosecutrix's testimony was properly received in evidence. We emphatically have quit the narrow-souled bias that the deaf-mute is of the status of an idiot "because he hath no possibility to understand what is forbidden by law to be done, or under what penalties": 1 Hale 34.[2] The unfortunate by nature are not to be

---

[2] See note 4 on that page in the first American edition by Stokes and Ingersoll (1847), where it is observed "that from the humane exertions of many ingenious and able persons, and from

made more unfortunate in law, or the impotence and the reproach is upon us. If qualified to be witnesses, if they can discriminate between what is right and what is wrong, if they know the truth and will say it "Such unfortunate persons may be witnesses, if able to communicate their ideas by signs through the medium of an interpreter, or by writing, if they write and read writing. And even if the witness can write, this does not prevent his testimony from being communicated by signs . . . 5 American and English Encyclopedia of Law, 119, and cases cited": State v. Howard, 118 Mo. 127, 143, 144 (1893), 24 S. W. 41. See also Sanders v. State, 150 Miss. 296 (1928), 116 So. 433, Cowley v. People, 83 N. Y. 464, 478 (1881). And further, what is required is simply that witness and interpreter understand each other and no standard or special sign language is necessary.

"Such a witness is not confined to the sign language common to deaf mutes, but, if his own arbitrary signs can be interpreted, he can testify through those signs . . .": 3 Wharton Criminal Evidence (11th ed.), 2020, sec. 1172. See People v. McGee, 1 Denio (N. Y.) 19, 23 (1845), State v. Weldon, 39 S. C. 318 (1893), 17 S. E. 688.

In John Ruston's Case, 1 Leach Cr. Cas. 408 (1786), 168 Eng. Rep. 306, a deaf and dumb man was able to communicate with his sister by arbitrary signs "which time and necessity had invented between them". She stated that he knew the nature of an oath and that she could convey to him that he was being sworn. Thereupon, being sworn herself and administering the oath to him, she was allowed to interpret his testimony. See also Skaggs v. State, 108 Ind. 53

---

the extensive charitable institutions for the instruction of the deaf and dumb, many of these unfortunate people have at the present day a very perfect knowledge of right and wrong". See Wigmore on Evidence (3rd ed.), sec. 498; Deaf and Dumb Persons, 8 A. & E. Encycl. of L. (2nd ed.), 842; 32 C. J. 757, and cases cited in notes. See also rule 101 of the Model Code of Evidence of the American Law Institute, and Act of May 23, 1887, P. L. 158, sec., 19 PS §681.

228 (1882), State v. DeWolf, 8 Conn. 93, 99 (1830), Wigmore on Evidence (3rd ed.,) secs. 498, 811.

Defendant is entitled to have vague or uncertain testimony kept out of the case, but prosecutrix is not to be denied her day in court. That does not mean that the court is guardian-angel; it means that if there be certainty to the recitation she gives through the expositor or intermediary it is for the consideration of the jury else injury upon her is with impunity and she is comfortless and the truth is smothered. For this is not a case where the witness is an infant or very young child without sense of the "danger and impiety of falsehood" or a person of small or unsound mind and thus unable basically to tell her story. This witness can relate it; the point is whether it is properly understood by those to whom she is trying to tell it. I think her story was obtained from her through the interpreter with sufficient certainty for submission to the jury. Mere conjecture as to her meaning is not permissible, but in this case an experienced worker with deaf-mutes interpreted her motions where he could; he frankly told the court when he was not able to convey the question to her and obtain an answer. The fact that a standard sign language was not used between them does not make the testimony inadmissible.

I do not yield to defendant's objection that he could not tell whether the witness understood the interpreter in giving the oath. Unless defendant, or his counsel, were a competent interpreter of deaf-mutes himself, he obviously could not tell. And this is so even though it is conceded that standard sign language is not being used. In such a situation reliance must be placed on a qualified interpreter and, when he says that he is making the witness understand his questions and that he understands her answers, it is enough for the consideration of the jury. It is true that there was not a word-for-word interpretation but, under the circumstances, none

could be expected. It is not a matter of translation from a foreign language where words are translatable almost one by one; here the communication is more general so that of necessity there is a translation of ideas rather than words.

It is conceded that in the present case the interpreter was able and impartial. The fact that he works with deaf-mutes is not to be considered as making him partial to such persons. For example, in State v. Smith, 203 Mo. 695 (1907), 102 S. W. 526, a professor at a State deaf and dumb institute where the prosecuting witness had been a pupil was held to be a competent and unbiased interpreter.

In a Philippine Islands case, People v. Bustos, 51 P. I. 385 (1928), the testimony of a deaf-mute was rejected because the interpreter could not at all times make out what the witness meant by her signs. The witness had never been a pupil of the interpreter nor had anything to do with her previously. It was held that it was too dangerous to admit the interpretation which might be mere conjecture as to the witness' meaning. I make mention of this case to show difference, but I do not agree with the decision and it is not in conformity with the trend of the United States cases. There, it might be added, the deaf-mute was not the injured party or prosecutrix but an alleged eye-witness in a homicide case.

In the circumstances of the present case, the method of administering the oath and taking the testimony of prosecutrix was proper and the testimony thus obtained was admissible; and with this testimony admitted the evidence as a whole is sufficient to sustain the conviction. Prosecutrix identified defendant and related how the assault took place. While the direct questions as to force and absence of consent were not asked, prosecutrix was asked generally to tell her story, and her answers were such (through the interpreter and also directly understood by the jury) that

the inference that the assault was against her will and accompanied by force was warranted. The testimony of the other witnesses was strongly corroborative of prosecutrix. While complete proof of rape was not produced, defendant was acquitted on this charge and convicted only of assault with intent to ravish. Of this there was adequate proof—proof beyond a reasonable doubt, and the conviction must be sustained.

Defendant's motion for a new trial is refused.

