THE STATE v. EPHRAIM BAKER, Appellant.—24 S. W. (2d) 1039.

Division Two, February 19, 1930.

*John H. Keith* for appellant.

*Stratton Shartel,* Attorney-General, and *Ray Weightman,* Assistant Attorney-General, for respondent.

848

COOLEY, C.—Defendant Ephraim Baker was charged by information in the Circuit Court of Reynolds County with the crime of murder in the first degree for the killing of one William Allison. Upon trial he was convicted on November 27, 1928, of murder in the second degree, and sentenced to twenty-five years' imprisonment in the penitentiary, and he appeals.

By the State's evidence the following facts are shown: Defendant, a man about fifty years of age, and deceased, who was sixty-nine, were neighboring farmers, their dwellings being about an eighth of a mile apart and fronting upon the same public road. R. L. Neely and William Walker were respectively road overseer and assistant road overseer for the road district which included the road running past the homes of defendant and deceased. The latter's son, Jesse Allison, lived with his father. Jesse owed poll tax which Neely and Walker had authorized him to pay by hauling and spreading gravel on the road at a point near defendant's house. On the day the trouble occurred, January 23, 1928, Jesse was engaged in this work, using a wagon and team, and his father was helping him. They were taking the gravel from a shallow creek or branch at the side of the road where it ran along defendant's land, and it appears defendant claimed that the place from which the gravel was being taken was upon his land, although it was very near, within a few

feet at most, the traveled portion of the road and with no fence between it and the traveled roadway.

The Allisons were in the road, Jesse on the wagon driving and William walking behind the wagon, when defendant came down the road from his home to meet them. It developed that defendant, before starting to the point where the Allisons were, had armed himself with a pistol, which he had concealed upon his person. When about even with the team defendant asked Jesse what he was doing there. Jesse stopped the team and replied that he was working out his poll tax. Defendant asked him who gave him permission and Jesse said that Neely and Walker had done so. Defendant said they were not the road bosses and had nothing to do with it. Defendant then said that they, the Allisons, were trespassing. By that time deceased, William Allison, had come up to the wagon and stopped just behind it and hearing defendant's accusation of trespassing said that "he didn't see how we were trespassing when we were working on a public road." Defendant thereupon "took about two steps toward the back end of the wagon," and drew his pistol and shot William Allison, and then fired a shot at Jesse, wounding him, but not seriously, in the arm and shoulder. Jesse's team started to run and for the moment he gave his attention to the team and while so engaged heard another shot and glancing back saw defendant "snapping" the pistol, apparently trying to shoot William again, but the pistol failed to fire. Stopping his team, Jesse, as he testified, saw defendant following up his attack upon William, with a knife, and he, Jesse, seized a shovel and ran to assist his father who was begging defendant not to cut him "as he had already killed him." Intervening, Jesse struck defendant with a shovel. A fight ensued between Jesse and defendant, the former testifying that defendant turned upon and attacked him with a knife. At the termination of this fight defendant was left lying, unconscious or nearly so, in the road, whence he was later assisted to his home by others.

William Allison was shot once, the bullet entering his body "three inches below the sternum on the left side," and lodging in the thoracic cavity. By probing the wound the physician concluded that the bullet ranged upward. It was not located. Allison died the next day as the result of that wound. Deceased's wife, who was at home, heard the shots fired and, her attention being thus attracted, stepped to the window and then to the porch and saw what followed, although she did not see the shooting. No one but William and Jesse and defendant was present when the trouble occurred or saw the shooting. Mrs. Allison's testimony corroborated Jesse's as to occurrences immediately following the firing of the shots.

Defendant testified in substance that from his mail box he saw the Allisons at work and went to the place where they were; that they were taking gravel from the branch on his land; that he armed himself with a pistol, because the Allisons had made threats against him and he was afraid they would attack him; that he asked them if they knew they were trespassing, to which they replied in the negative, saying that they had a right there; asked who gave them the right, they said Neely and Walker; that following the latter statement there was a quarrel, but he could not remember what was said; that he started to go back to the house, whereupon "they took after me, Jesse and Bill did, with their shovels;" that the Allisons beat him about the head and body with their shovels until he was almost paralyzed, and that pretty soon he "started to go down," and then, "I tried to protect my life with a gun." He testified that he shot, but did not remember how many times, and that that was the last thing he remembered of the afternoon's occurrences; that he did not "come to himself so that he could remember anything" for over a week. Defendant proved a previous good character as a peaceable, law-abiding man.

There was evidence *pro* and *con* as to whether Mrs. Allison could have seen from the house what she claimed to have seen.

The court's instructions to the jury submitted the issues of murder in the first and second degrees, manslaughter and self-defense. Appropriate instructions were also given upon the subjects of good character, presumption of innocence and reasonable doubt.

I. Defendant's first contention is that the verdict is "against the evidence and against the weight of the evidence . . . . and there is no legal, substantial evidence to support the verdict of the jury in that the greater weight of evidence showed that defendant shot deceased in self-defense." Defendant seems to base this contention upon the argument that Jesse Allison's testimony is unworthy of belief, because the physician who probed deceased's wound said the bullet "ranged upward," and if so it could not have been fired when the defendant and deceased were both standing, hence defendant's testimony that he fired when he was falling or had fallen must be true. How much "upward" the bullet ranged and what may have caused it to do so are facts not shown by the evidence. Neither was there any effort made to show that a leaden bullet fired from a pistol may not be deflected somewhat from its course upon striking a human body. We cannot take judicial notice that it might not be so deflected nor can we tell from the evidence the exact position of deceased's body with reference to the course of the bullet at the moment the bullet struck deceased. That argument was a matter for the consideration of the jury, but can be of no avail here in the face of the positive testimony. Jesse Allison told a straightforward

story and was not impeached. The credibility of the witnesses and the weight of their evidence were for the determination of the jury. It is clear that this contention of defendant's cannot be sustained.

II. Defendant's further contention that the evidence showed at most nothing more than manslaughter and that the court therefore erred in submitting murder in either degree, must likewise be disallowed. Judged from the standpoint of the State's evidence the offense was clearly murder. The State's evidence shows an utter lack of any provocation sufficient to reduce the grade of homicide from murder to manslaughter. [State v. Farris (Mo.), 6 S. W. (2d) 903.] Defendant was given the benefit of instructions on manslaughter and self-defense. based upon his own testimony, as was proper, but the jury disbelieved his testimony. The evidence so clearly justified and required submission to the jury of the offense of which defendant was convicted that it is unnecessary to discuss that point further.

III. Complaint is made that the court erred in permitting Dr. Brandon, who waited upon deceased at the hospital to which he was taken after being shot, to testify that deceased made a statement to the witness relative to his (deceased's) condition. Dr. Brandon was asked if deceased when brought to the hospital, "made any statement . . . as to the seriousness of his condition," to which witness replied: "Yes, sir." The State was probably attempting to lay the foundation for the introduction of a dying declaration, as such attempt was later made, unsuccessfully, with other witnesses, but no further question along that line was put to Dr. Brandon and he did not state what the deceased had said to him. Obviously defendant could not have been prejudiced by the above question and answer.

IV. Defendant assigns error in that one of the trial jurors had, prior to his selection as such juror, formed, and expressed an opinion relative to defendant's guilt, which alleged fact was not disclosed by the juror on his *voir dire* examination and was not known to defendant or his counsel until after the trial. The motion for new trial preserves this objection and the evidence heard by the trial court relative thereto.

Defendant called a witness who testified that a few days after defendant's preliminary examination he met the juror in question and remarked that he, the witness, believed defendant would come clear and that the juror said: "No, I don't think so. He must have left the house with that old gun in his pocket and he certainly meant to kill them or he wouldn't have taken it." The witness ad-

mitted that he was a close enough friend of defendant that he had signed defendant's appearance bond and had come to the court for the purpose of signing defendant's appeal bond· if necessary, but said that he had not told defendant or his counsel of the alleged statement made by the juror and had not told anyone until about the time the verdict was rendered, when he told Henry Baker (a near relative of defendant); that the only reason he had for not telling defendant or his counsel was that he hated to expose his neighbor that way.

The juror, being called by the State as a witness upon the hearing of the motion, emphatically denied making the alleged statement or having any conversation with the witness about the case, or having formed or· expressed any opinion as to defendant's guilt or innocence prior to his selection as a juror. Defendant's witness in support of his motion and the accused juror were both examined and cross-examined fully relative to the alleged statement. The trial court after hearing the evidence found against defendant's contention and overruled the motion for new trial.

In support of his contention that the juror referred to was conclusively shown to have prejudged the case and concealed the fact when questioned on *voir dire* examination, defendant cites several decisions. In State v. Wyatt, 50 Mo. 309, it was charged in the motion for new trial that a juror had, prior to the trial, expressed the belief that defendant was guilty. The charge was supported by at least two clear and explicit affidavits of unimpeached witnesses. The juror filed a counter statement admitting that he had made the statement attributed to him, but claiming that he was thinking of a different case. This court held that his affidavit was not satisfactory and from reading all the statements together the court was of the opinion that the juror was disqualified and that a new trial should have been granted.

State v. Burnside, 37 Mo. 343, was a case in which a similar charge was made, supported by affidavits of three credible and unimpeached witnesses. The juror made a counter affidavit denying the charge, and it was shown by other affidavits that the juror bore a good reputation for veracity. It was held that a new trial should have been granted, the court saying:

"It is to be here observed that the affidavits of the witnesses, ascribing the statement to the juror, are direct and positive, and cannot be overcome by the negative testimony by which they were sought to be counteracted. No effort was made to impeach their character for veracity, and hence we must take their affidavits to be true."

In State v. Taylor, 64 Mo. 358, where a similar charge supported by three affidavits was made, the counter affidavit made by the

juror was evasive, admitting some things which the court thought showed he was prejudiced, and as stated in the opinion (l. c. 363): "The juror, in his affidavit, does not positively deny the remarks attributed to him, while the affiants, on the other side, testify positively to his statements." He was held upon the showing made to be disqualified.

In State v. Ross, 29 Mo. 32, the trial court deemed that the statute precluded inquiry into the alleged prejudgment of the case by a juror after he was sworn, and did not pass on the credibility of the witnesses, which construction of the statute this court held to be error. The case is not in point on the question here presented, nor is Williams v. Fleming, 284 S. W. 794, 796, but for other reasons.

The foregoing are the cases cited by appellant. The one that seems most strongly in appellant's favor is State v. Burnside, supra. The conclusion there reached, upon the record presented, may be well enough. But what is there said should not be understood to mean that when a question of this nature is presented upon a motion for new trial the trial court is without authority to pass upon the credibility of the evidence presented. The trial court's conclusion may be erroneous, and if so convinced it would be our right and duty to correct the error. But in the first instance that court may and should determine the question upon the evidence presented. Speaking of a similar complaint in State v. Howard, 118 Mo. 127, 136, 24 S. W. 41, this court said:

". . . The circuit judge possessed far better opportunities than we of determining the very right of the matter here at issue, and as there were affidavits *pro* and *con* on this point; as the trial judge was doubtless acquainted with each of the affiants; as every lawyer knows how easily affidavits impeaching the impartiality of jurors are procured, and when the dangerous consequences which would result from lending too facile an ear to post-trial complaints of this sort are considered, we feel no inclination to hold otherwise on this point than did the trial court."

State v. Howard, supra, was cited and followed on that point in State v. Taylor, 134 Mo. 109, 161, 35 S. W. 92, and in State v. Sebastian, 215 Mo. 58, 89, 114 S. W. 522.

What we have quoted from the Howard case is applicable to the instant case. But one witness testified for defendant relative to the statement attributed to the juror and that witness's testimony was explicitly denied under oath by the juror. The trial court saw and heard both and was in better position than are we to determine the truth of the matter. We have no reason to doubt the correctness of his conclusion.

V. Some other assignments of error are made in defendant's motion for new trial, but are not urged here, and apparently have

been abandoned. We have, however, examined them and we find them without merit. The information is in the form often approved by this court, aptly charging murder in the first degree, therefore murder in the second degree. Verdict and judgment are in due form. Defendant appears to have had a fair trial and the verdict is supported by substantial evidence.

There being no error in the record the judgment is affirmed. *Davis* and *Henwood, CC.*, concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All of the judges concur, except *Walker, J.*, absent.