STATE of Missouri, Respondent,

v.

Larry Lee POLLARD, Appellant.

No. 54065.

Supreme Court of Missouri,
Division No. 2.

Nov. 10, 1969.

Motion for Rehearing or to Transfer to Court
En Banc Denied Dec. 8, 1969.

------

John C. Danforth, Atty. Gen., Warren K. Morgens, Asst. Atty. Gen., Jefferson City, for respondent.

Madigan & Hadican, J. Martin Hadican, St. Louis, for appellant.

MORGAN, Judge.

Defendant was charged with the crime of forcible rape. The punishment provided by statute ranged from two years imprisonment to death. Section 559.260, RSMo 1959, V.A.M.S. The jury assessed punishment at fifty years imprisonment and defendant has appealed.

The issues presented here do not demand a detailed recitation of all the evidence. Connie, Tommie and Gloria, three young girls, left their place of employment in downtown St. Louis at approximately midnight on May 23, 1967. They walked two blocks to a parking lot to ride in Gloria's car to their apartment house. As they got into the front seat, there was a "shot" which struck Tommie in the lower chest, and defendant forced himself into the back seat. While pointing a gun at them, a few of defendant's immediate comments were: "drive," "get out of here," and "I've already killed three people and a few more won't make any difference, so do as I say." He told Gloria to drive west on U. S. Highway 40 with the command "don't do anything to attract attention." The first stop was at a filling station. Gloria was told to buy one dollar's worth of gas, and "Don't make a move * * *" Later a stop was made that defendant could drive. His speed was 95 to 100 miles per hour. They traveled across St. Charles County and in Warren County defendant turned off on secondary roads. He stopped, pointed the gun at Gloria and Connie, ordered them to get out of the car and said, "Put your hands up." He relieved himself and ordered the two back into the car. After more driving, he again stopped and directed the same two girls to stand in the road and "strip." He put their clothes on top of the car and ordered them to start walking into a field. Tommie, who had been moaning, apparently regained consciousness and from the car called, "Mr., come here * * * don't do anything to us." Defendant then had the two girls dress and get back into the car. A further comment was that if they cooperated, he wouldn't have to kill them. When they begged defendant to take Tommie to a doctor, he said he was looking for one. He, again, drove at a high speed and failed to make a corner. The car went through a fence and stopped in a barn lot. Connie, after recovering from being knocked unconscious, found defendant and Gloria missing. She consoled Tommie and then went for help. Fearing defendant was nearby, she skipped the first farm residence and at the second awakened the occupants who called the law enforcement officials. She and Tommie were taken to a hospital in St. Charles. After the wreck, defendant told Gloria, "Come on, we're leaving." He led her some distance across a field to where he had intercourse with her. He then climbed a small tree to observe what might be going on at the car. Soon after another act of intercourse, he observed officers at the wreck and the patrol plane overhead. Defendant attempted to burn a driver's license and other papers taken

from a billfold. All of which indicated different names from that of defendant. When defendant and Gloria returned to the car, it was nearly daylight and the officers were there. Gloria was taken to a doctor. After his arrest, defendant signed a written statement. It was consistent with the testimony previously outlined, but after explaining the wreck and that he and Gloria left alone, he said, "This is where I want to talk to a lawyer before I go any farther."

Defendant testified at the trial. He did not deny any of the events of the night, except to say that Gloria offered no resistance to his advances. Gloria testified that intercourse followed such statements as "do what I tell you, you won't get hurt" and "it was going to happen one way or the other so I might as well cooperate with him." She expressed a fear of striking defendant or making him mad, but testified she tried to dissuade him by talking and continuing to shove on his chest. His gun, at first in a shoulder holster, was placed beside them.

■ First, defendant contends the trial court erred in conducting the trial in the National Guard Armory instead of in the regular courthouse, and publishing its intent to do so. The trial judge, relying upon a Grand Jury finding, " * * * that the Warren County Courthouse was dangerous and unfit for occupancy; that the joists in the attic are separating; that the walls * * * are separating; * * *," ordered the trial held in the Armory Building and designated it as a "temporary courtroom," " * * * in the interest of the safety of said jurors, witnesses, court personnel and the public at large." This order was published. The parties agree that Section 510.-200 provides, "All trials upon the merits shall be conducted in open court and so far as convenient in the regular courtroom," and that this court has heretofore approved the use of temporary facilities for conducting court proceedings. For an extended discussion of this point see State ex rel. Green v. James, 355 Mo. 223, 195 S.W.2d 669, 671. However, in such instances, regardless of the necessity for use of temporary facilities, this court has always considered whether or not any of the parties were thereby prejudiced. Defendant fails to designate any specific feature of the building or particular incident, occasioned by use of the temporary facilities, from which prejudice resulted. In searching the record, we, too, fail to find any. The argument is based on the general thought that the armory itself created an atmosphere of militancy and hostility. To the contrary, from the record it is obvious that the entire trial was conducted calmly and with decorum, with practically no conflict in the evidence, and with all due solemnity demanded by the proceedings. Further, the notice to jurors and others of the place of the trial was formal and for the convenience of all concerned, and, indeed, protected the right of defendant to have a public trial. We do not, contrary to defendant's suggestion, see the necessity for comparing this rather perfunctory notice with the extensive publicity found in Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543. The argument is without merit.

■ Second, it is charged that defendant was prejudiced by the manner in which the jury was selected. The state did not waive the death penalty and qualified the jury as provided in Section 546.130, which, in part, provides: "Persons whose opinions are such as to *preclude* them from finding any defendant guilty of an offense punishable with death, shall be ineligible to serve as jurors on the trial of an indictment or information charging any such offense, * * *." (Emphasis added.) For this reason, defendant contends he was not provided a fair and impartial jury and was thereby denied due process of law. Reliance is placed on the holding in the case of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). There are two basic reasons why this argument must fail.

(1) The jury in the instant case did not assess the death penalty. In the case of Bumper v. North Carolina, 391 U.S. 543,

545, 88 S.Ct. 1788, 20 L.Ed.2d 797, decided on the same day as Witherspoon, and reported immediately after it in the U. S. Reports, the United States Supreme Court declared: "Our decision in Witherspoon does not govern the present case, because here the jury recommended a sentence of life imprisonment."

(2) The procedure followed here, although had prior to publication of Witherspoon, is entirely consistent therewith. In Witherspoon, 391 U.S. at pages 513–514, 88 S.Ct. at page 1772, it was declared that the holding did not " * * * involve the State's assertion of a right to exclude from the jury in a capital case those who say that they *could never vote* to impose the death penalty or that they would refuse even to consider its imposition in the case before them." (Emphasis added.) Section 546.-130, in limiting its exclusionary provisions only to those persons whose opinions "preclude" such a finding, meets the demands of Witherspoon. The voir dire question asked in the instant case was: "Do you have any moral, conscientious or religious scruple which would make it *impossible* for you to bring in a verdict of death if you were convinced that such a verdict is fair and just?" (Emphasis added.) This same question was approved by this court in State v. Swinburne, Mo., 324 S.W.2d 746, 751 (1959). See State v. Pinkston, 336 Mo. 614, 79 S.W.2d 1046, 1049 [6]. The statute and question are compatible with the holding in Witherspoon in that both only contemplate exclusion of those that "could never vote to impose the death penalty." There is a further and very fundamental reason for approval of both. It has always been the duty and function of the legislative branch of government to designate the range of punishment for any specific crime. For the judiciary to demand that potential jurors be considered qualified, when they have evidenced a refusal to consider all possible punishments authorized, would be nothing more than a usurpation by the courts of a recognized legislative function. There was no error in the procedure followed.

Third, it is argued that defendant was prejudiced by admission of testimony pertaining to the events in the City of St. Louis, which occurred some four hours prior to the actual offense for which he was tried. It is correctly asserted that as a general rule evidence tending to show a defendant guilty of the commission of other crimes is not admissible. State v. Mathis, Mo., 375 S.W.2d 196, 198. However, one of the recognized exceptions is that evidence of other crimes is admissible when it tends to establish the particular crime charged. State v. Atkinson, Mo., 293 S.W.2d 941. The most vital issue, and in fact the only one created by the evidence, was whether or not the resistance offered by the victim was sufficient to establish the crime of rape. By her own testimony, physical resistance was limited because she was overcome by fear, and it was incumbent on the state to establish there was reasonable cause for such fear. All of the evidence offered tended to establish the reasonableness of such fear and apprehension. "Essentially, this whole series of acts constituted one continuous transaction. * * * A defendant cannot expect to exclude acts of brutality perpetrated in the commission of a crime and performed as the very means of accomplishing it." State v. Swinburne, supra, 324 S.W.2d loc. cit. 752. Point three is ruled against defendant.

Fourth, it is next argued that defendant was prejudiced by admission of a picture taken of him at the time of his arrest, because it portrayed him in a dirty and unkempt condition. Initially, this question rests in the sound discretion of the trial court, and its decision will not be disturbed absent a showing of abuse. The state could not assume defendant would testify, and this picture tended to identify and connect him with the crime. In addition, we have examined the photo and it does not depict defendant as dirty or unkempt and could not have been, by any stretch of the imagination, considered inflammatory.

Fifth, complaint is made that admission of defendant's written statement

was error; not because it was not voluntarily given, but because it related events of the night that did not occur in Warren County. The same argument was ruled against defendant while considering point three.

The judgment is affirmed.

All of the Judges concur.