**STATE of Missouri, Respondent,**

v.

**William COLEMAN, Appellant.**

No. 55226.

Supreme Court of Missouri,
En Banc.

Dec. 14, 1970.

John C. Danforth, Atty. Gen., Dale L. Rollings, Asst. Atty. Gen., Jefferson City, for respondent.

Terence C. Porter, Columbia, for appellant.

HOLMAN, Judge.

The information in this case charged defendant with felony-murder (first degree) in the commission of arson as a result of which Geraldine Settle was burned to death. See § 559.010.[1] A trial resulted in a verdict of guilty and the death penalty was assessed. See § 559.-030. Defendant has appealed.

On this appeal there is no contention that the evidence was insufficient to support the submission of the offense charged and hence it is not necessary for us to set out all of the sordid details of the tragic occurrence hereinafter described.

The event in question occurred in the Randolph Tavern located at 107 West Reed Street in Moberly, Missouri. There was substantial evidence from which the jury could reasonably have found that on February 16, 1968, shortly before four o'clock in the afternoon, defendant went to a filling station located a little more than a block from the tavern and borrowed a 5-gallon open bucket. He then purchased four gallons of gasoline which were pumped into the bucket and carried the bucket of gasoline to the tavern. It was a fairly warm day and the door of the tavern was open. He stepped inside and took two or three "slings" of the bucket in a manner which threw the gasoline onto the east wall, a bowling machine in that area, and onto the floor of the tavern. He then stepped back, lit a match, and threw the match into the gasoline on the floor, and left the tavern. There were sixteen people in the tavern at that time. Almost immediately there was a slight explosion which blew the door shut and created a pressure inside the tavern which made it difficult to open the door. The four people closest to the door, however, were able to escape without serious injury, although two of them were substantially burned. They were Vivian McSparren and a baby she was holding, Virgil Hill, and Charles Buckler. The other twelve people in the tavern, including the bar tender, Geraldine Settle, were killed, the coroner testifying that their deaths resulted from suffocation from smoke inhalation and from burning. The bodies of eight of those twelve persons were found piled in front of a back door. Shortly after the four survivors escaped from the tavern there was a terrific explosion which blew out the front windows. After the fire was started, defendant went to the Pastime Tavern located across the street and asked the owner to take him to the police sta-

---

1. All statutory references are to RSMo 1969, V.A.M.S.

tion. The owner, Edward Kempker, asked his wife to "drop him off at the station as she was about to start on an errand at that time." As defendant left to get in the car he said something to Mr. Kempker to the effect that "I did that," referring to the fire across the street. Defendant was taken to the police station a short distance away and surrendered to the chief of police.

The motive of the defendant was not entirely clear from the evidence. There were, however, several items of evidence that might indicate his motive. Defendant had been rather active on the day in question in looking for his wife from whom he was separated. A few hours before the fire defendant went to see Victor Rigler and made an agreement to buy a car from him which he would return for in a few days, saying that he wanted the car to leave town. In the discussion with Rigler he said, "When I leave this town they are going to remember me. I·am going to make history." A short time later defendant asked Ordell Rodney to take him to Huntsville because he had been told his wife was there at Freeman's Bar. Defendant was unable to find his wife in Huntsville and after returning to Moberly, as he was leaving the car, he said to Mr. Rodney that maybe this would be the last time he would see him because the "bastards were hiding his wife and that they would be sorry about it," or words to that effect. Mrs. Kempker testified that as she was taking defendant to the police station he started to cry and said, "I loved my wife, I loved my wife, I loved my wife"; that "those crazy s.o.b.'s were hiding her, I always thought so, but I didn't know it until today." There was also evidence that as a condition for obtaining a license to operate the Randolph Tavern the owner had been required by the District Liquor Inspector to refuse service to defendant, as well as certain other ex-convicts, and that defendant knew of that fact. The foregoing evidence would appear to warrant a reasonable conclusion that defend-

ant may have started the fire either because he had been barred from service at the tavern or because he thought that the operators of the tavern were hiding his wife. It should be stated at this point, however, that the evidence indicated that the owner of the tavern, and many of the persons who were killed in the fire, seemed to have been friends of the defendant.

The defense in the case was that the fire was an accident. Defendant testified in the case. At the beginning of his testimony he detailed quite a number of convictions which resulted in his having been confined to penal institutions most of the time between 1946 and 1965. In regard to the events occurring on the day in question .defendant testified that he had borrowed the car of Bobby Hess a few days before and while driving it the transmission had been torn out and he had parked it at the sale barn at the south edge of Moberly; that on the afternoon in question he had intended to find Bobby so that they could go to the sale barn and repair the car; that he went to the filling station and obtained the gasoline so that he could wash his tools and keep his hands clean while working on the car; that he walked on down to the Randolph Tavern looking for Bobby Hess; that he looked in the windows and couldn't see anything because the windows were steamed and that he walked into the tavern so that he could see who was in there; that at this point Vivian McSparren said, "Say, Billy," and that as he turned to look at her she was lighting a cigarette; that when she flipped the match it lit on his sleeve and ignited gasoline which had splashed on his sleeve, and that he then threw the open bucket (apparently in an involuntary effort to get in a position to put out the fire on his sleeve); that he turned the sleeve wrong-side-out and ran out the door and across the street. On cross-examination defendant conceded that he knew there were filling stations located very near to the sale barn where the Hess car was

parked so that it was not necessary to buy the gasoline at a downtown station.

Vivian McSparren testified that she had previously quit smoking, did not smoke during February 1968, and of course did not light any cigarette or match on the occasion in question. Her testimony in that respect was corroborated by other witnesses.

■ The first point raised is that the trial court erred in failing to grant defendant a new trial because of the failure of Juror Vincent Sherwood to disclose on voir dire examination that prior to trial he had expressed an opinion as to the guilt of the defendant and the punishment to which he should be subjected. During the voir dire examination the court asked the following question: "Have any of you formed or expressed an opinion as to the guilt or innocence of the defendant in this case, based on what you've heard or read about the case? Now, if you have, please stand up." Mr. Sherwood did not respond. On individual examination the following appears: "Mr. Sherwood: I knew Mr. Lowery [one of the victims] pretty well and his whole family. His wife was my wife's beauty operator at the time of his death. Mr. Porter: Mr. Sherwood, do you feel that connection or relationship with Mr. Lowery would affect your ability to sit as an impartial juror in this case? Mr. Sherwood: No, I don't think so. Mr. Porter: You feel that despite this relationship you would not be prejudiced in any way, either for or against either of the parties to this case? Mr. Sherwood: No."

Mr. Sherwood, on the dates in question, was the proprietor of and worked in a barber shop in Moberly. As a part of his motion for new trial defendant attached the affidavit of James M. Lewis. It contained, in part, the following: "Some time during the week beginning Monday, February 19, 1968 * * * I was in the Oak Barber Shop. * * * Vincent Sherwood was, during that week * * *

working as a barber at the Shop. * * * The topic of conversation in Moberly, Missouri, was almost universally related to the tragic fire at the Randolph Hotel Tavern * * *. I distinctly remember Mr. Vincent Sherwood saying, referring to Bill Coleman, 'They oughtn't to even give a man like that a trial. * * * In substance he expressed a view that William Coleman should be disposed of by violence, and it was apparent that he had already made up his mind that William Coleman was guilty of the charge of murder.'" Thereafter, the State filed the affidavit of Sherwood which stated, in part, that "James M. Lewis, in his affidavit, attributes to me the statement, 'They oughtn't to even give a man like that a trial'; all I can say is that I do not have any independent recollection of saying any such a thing; I do not believe that I made the statement because the philosophy expressed in the statement is not a true and accurate statement of my present beliefs, the beliefs I held at the time of the Coleman trial, or my beliefs at any time during my life to which my memory extends; it is very possible that Mr. Lewis, or some other customer or visitor made statements with which I did not take exception, thereby giving rise to Mr. Lewis' inaccurate recollection or interpretation of my attitude. I further state * * * that * * * at the time I was asked questions by the judge and the lawyers to see if I were qualified, at the time I was sworn as a member of the jury to try the Coleman case, and during the entire trial, I was an impartial person without an opinion of the guilt or innocence of William Coleman of the offense charged and I was well able to base my verdict solely upon the evidence introduced at the trial." At the time the motion was heard both of these men testified substantially in accordance with their affidavits. However, we think the following from Mr. Sherwood's testimony is significant: "Q [by Mr. Porter] Did you make any statement that indicated your feelings at that time were to the effect this man should be dis-

posed of summarily as they did in the old days, take them out and hang them? A No, sir. I don't believe that. I think any man is entitled to a trial. Q Did you make any statements like that, that's the question. A No, sir." It is also of interest that Mr. Lewis testified that another barber by the name of Sherwood was working in the shop at the time the statements were alleged to have been made, but that Juror Sherwood testified that the "other Sherwood" did not start work in the shop until July 1, 1968.

In support of this contention defendant has cited several cases which state well-settled rules, such as State v. Kirkpatrick, Mo.Sup., 428 S.W.2d 513, at page 516, wherein this court said: "There is no question that a defendant in a criminal case is entitled to a full panel of qualified jurors before he is required to make his peremptory challenges, State v. Foley, 144 Mo. 600, 46 S.W. 733, 735 [1]; State v. Naylor, 328 Mo. 335, 40 S.W.2d 1079, 1083 [7]; and that prejudice of a juror, concealed on examination and discovered only after verdict, is ground for a new trial." He places primary reliance, however, upon the early case of State v. Burnside, Mo.Sup., 37 Mo. 343. In that case a juror stated on voir dire that he had not formed or expressed an opinion as to the guilt of defendant. After trial the affidavits of three persons were filed in which each affiant stated he had heard the juror declare that he believed the defendant guilty. The juror signed a counter-affidavit denying any such statement, and affidavits of other persons were filed who swore that the juror was of good character and worthy of belief. In disposing of the case the court stated that "It is to be here observed that the affidavit of the witnesses, ascribing the statement to the juror, are direct and positive, and cannot be overcome by the negative testimony by which they were sought to be counteracted. No effort was made to impeach their character for veracity, and hence we must take their affidavits to be true." That statement is obviously incorrect and unsound. None of the affidavits should have been taken as true as a matter of law. It was for the court to determine the facts from the conflicting affidavits on the basis of credibility. In State v. Baker, 324 Mo. 846, 24 S.W.2d 1039, l. c. 1042, this court discussed Burnside and, in effect, overruled it insofar as the foregoing statement is concerned, as follows: "The foregoing are the cases cited by appellant. The one that seems most strongly in appellant's favor is State v. Burnside, supra. The conclusion there reached, upon the record presented, may be well enough. But what is there said should not be understood to mean that when a question of this nature is presented upon a motion for new trial the trial court is without authority to pass upon the credibility of the evidence presented. The trial court's conclusion may be erroneous, and, if so convinced, it would be our right and duty to correct the error. But in the first instance that court may and should determine the question upon the evidence presented. Speaking of a similar complaint in State v. Howard, 118 Mo. 127, 136, 24 S.W. 41, 43, this court said: '* * * The circuit judge possessed far better opportunities than we of determining the very right of the matter here at issue, and as there were affidavits pro and con on this point; as the trial judge was doubtless acquainted with each of the affiants; as every lawyer knows how easily affidavits impeaching the impartiality of jurors are procured; and when the dangerous consequences which would result from lending too facile an ear to post-trial complaints of this sort are considered,—we feel no inclination to hold otherwise on this point than did the trial court." See also State v. Proffer, Mo.Sup., 159 S.W.2d 681 [5].

In our review of this contention we have concluded that the trial court did not err in failing to grant a new trial. There was evidence to indicate, as is well known, that there is a great deal of conversation in barber shops concerning current events and that the subject of this fire was extensively discussed. It is understandable that Juror

Sherwood could not remember (18 months later) the various statements he may have made in the days immediately following the fire. However, he positively denied making the statement that defendant should be taken out and hanged, and he said he had no recollection concerning any statement to the effect that defendant was not entitled to a trial. The trial court obviously believed Mr. Sherwood and we can see no reason why we should not defer to that finding. Considering Mr. Sherwood's testimony as true we cannot see how defendant could possibly have suffered prejudice. If, at the time of voir dire, the juror did not remember having made any of the statements attributed to him, how could he have disclosed those alleged statements and opinions to the court? And how could the defendant have been prejudiced by the fact that the juror may have made some statement of that kind if such had completely passed out of his mind, and, of course, did not influence his decision to agree to the verdict? The answer to those questions is obvious. As indicated, we rule this contention adversely to defendant.

■ The next contention is that the trial court erred in giving Instruction No. 7 which reads as follows: "The court instructs the jury that any evidence of prior conviction of the defendant is to be received not as any evidence of the defendant's guilt in this case on trial, but is received by the jury solely and exclusively for the purpose of affecting his credibility, if any, as a witness in this case."

At the outset of our consideration of that instruction we observe that it obviously was intended for the benefit of the defendant. It has long been considered appropriate to give an instruction of that kind when prior convictions of defendant have been shown and this court has held that it is reversible error to refuse such when offered by defendant. State v. Davenport, 342 Mo. 996, 119 S.W.2d 291. One of the particular attacks on the instruction is that because of the words

"if any" following the word "credibility" the jury could infer that the court felt that the defendant was totally lacking in credibility and hence it was an unfair comment on the evidence. This particular form appears in Raymond, Missouri Instructions, Vol. 4, p. 245, § 10356. A reference to the case from which the instruction was taken, State v. Wilkins, Mo. Sup., 100 S.W.2d 889 [21], discloses that the precise complaint was made there. In Wilkins we indicated our view that the words "if any" were erroneously placed but that such was not prejudicial. In so ruling the court said: "Appellants assert that the words 'if any' appearing after the word 'credibility' tended to lead the jury to believe that the trial court had some doubt of the defendant's credibility as a witness. This contention is without merit. The instruction given for defendants' benefit plainly informed the jury that the prior conviction should not be considered as any evidence of the defendants' guilt. This was its main purpose and could not have been misunderstood by the jury, because the words 'if any' were misplaced."

In our review of the instruction as applied to this case we have concluded that the use of the words "if any" did not constitute prejudicial error. If the jury attached any particular meaning to the words it must have been that the trial court was endeavoring to avoid any direction or expression of opinion that the jury should or should not give credit to defendant's testimony. We agree with the statement in Wilkins that a jury would not misunderstand the real purpose of the instruction and we think it was beneficial to the defendant in this case.

■ Two other contentions of error relating to Instruction No. 7 are briefed but will not be considered because they were not mentioned in the motion for new trial as required by S.Ct. Rule 27.20(a).

■ At a pretrial conference defendant's attorney asked the prosecuting attor-

ney if he proposed to call any witnesses who would testify that defendant William Coleman had made any statement to them about the manner in which the fire of February 16, 1968, occurred or was started. The prosecutor stated there were no written statements but agreed to later give him the names of any such witnesses and the substance of any oral statement they would testify to. Defendant now contends that he was denied due process of law and was greatly prejudiced because Mr. Falzone did not give him the names of Jo Ann and Edward Kempker. It will be remembered that Jo Ann testified to the effect that defendant told her that he loved his wife and those s.o.b.'s were hiding her, and that Mr. Kempker testified that defendant said something to the effect that "I did that." While, for obvious reasons, defendant does not expressly say so it is necessarily implicit in his contention that the testimony of these witnesses as to his statements should have been excluded. See, for analogy, the practice in civil cases, Thomas v. Fitch, Mo.App., 435 S.W.2d 703. However, defendant did not object to the testimony or move to strike it after it had been given. The point was first raised in the motion for new trial. In that situation, we have held since the early case of State v. Fischer, 124 Mo. 460, 27 S.W. 1109, 1110, that the alleged error is not preserved for review. In that case we said that "[i]t was also contended that the court committed error in allowing Mrs. Phillips, the mother of the prosecuting witness, to testify to statements made by her daughter Ida about being seduced, that the defendant had promised to marry her, and as to what she said about her preparations to get married. The record does not show that any objection was made at the time to the introduction of this testimony, and it could not be raised for the first time in the motion for a new trial. A party cannot sit quietly by, and not object to the introduction of incompetent testimony, and afterwards, in the event that the result of the proceedings is adverse to him, obtain a new trial upon the ground of its admission. If he would save the point, he must object at the time it is offered, and, if the objection be overruled, save his exceptions; otherwise, he will not be heard to complain." See also State v. Anderson, Mo.Sup., 375 S.W.2d 116 [8]. As indicated, we rule that this point is not properly before us for review.

■ At the time of arraignment defendant entered a plea of not guilty by reason of mental disease excluding responsibility. However, it is apparent from the defendant's opening statement and the trial proceedings that the defense relating to mental disease had been abandoned. Nevertheless, defendant called as a witness Dr. Hartnett, a psychiatrist who had examined defendant. This witness expressed the opinion that defendant had no psychosis or other mental disease or defect which rendered him incapable of appreciating the wrongfulness of his conduct or of conforming his conduct to the requirements of law. The witness did state, however, that he had made a diagnosis of antisocial behavior. Defendant's attorney then asked the witness this question: "If you were examining this patient for the purpose of making a diagnosis for treatment, what recommendations for treatment or no treatment would you make?" An objection was sustained. Defendant now contends that the court's ruling was erroneous because he should have been permitted to prove that his mental condition was of a type susceptible of treatment and therefore that he was susceptible of rehabilitation and reformation so that the jury could consider that fact in its decision as to whether to assess the punishment at death or life imprisonment. He says that said evidence would have permitted the jury to consider that if they fixed the punishment at life imprisonment the defendant could have been rehabilitated, later paroled, and would become a useful citizen. The only case cited by defendant is People v. Morse, 60 Cal.2d 631, 36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.2d 810. While we think that case actually supports a contrary view it, in

any event, is not applicable because of the California procedure of having a separate trial to decide punishment.

We think it is obvious that this point must be ruled against defendant. This proposed evidence was not relevant to any issue submitted to the jury. Many cases have held that evidence offered for the purpose of invoking sympathy on the part of the jury should be excluded. And in this case the defendant's theory contemplates the possibility of a parole and we have held that questions of parole and future clemency are extraneous to a proper determination of the issues of guilt and punishment by the jury. State v. Rollins, Mo.Sup., 449 S.W.2d 585 [5].

■ Defendant also contends that the judgment cannot stand because he was not charged by indictment. He cites a portion of the Fifth Amendment to the U. S. Constitution which reads, "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury * * *." We rule this point against defendant without extended discussion. The Missouri Constitution, Art. I, § 17, permits prosecutions by either indictment or information. We have repeatedly held that the Fifth Amendment, in the respect under consideration, is a limitation on the powers of the government of the United States and not upon the governments of the several states. See State v. Martin, Mo.Sup., 395 S.W.2d 97 [2], and cases cited therein. The point is disallowed.

■ The next point briefed is that "the appellant was deprived of an impartial jury in violation of the Sixth and Fourteenth Amendments to the Constitution of the United States by virtue of the procedure employed by the State in excluding from the jury all persons with moral and religious scruples against imposing the death penalty." During the voir dire the prosecuting attorney asked the panel the following question: "Does any member of the jury, assuming the judge instructs you in the event you find the defendant guilty of murder in the first degree that the punishment may be either life or death, do any of you have a moral or religious scruple that would prevent you from considering the death penalty in the event you find the defendant guilty of murder in the first degree?" Eight members of the panel responded affirmatively. At the conclusion of the voir dire the court sustained a challenge for cause by the State as to four of that number and the other four were stricken from the panel by the State's exercise of its peremptory challenges.

As indicated, defendant contends that the result of the procedure here followed was to exclude from the jury all panel members who had moral or religious scruples against the death penalty and that such violated the Sixth and Fourteenth Amendments to the U. S. Constitution and Art. I, § 18(a), Missouri Constitution 1945. He cites Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, and Boulden v. Holman, 394 U.S. 478, 89 S.Ct. 1138, 22 L. Ed.2d 433.

Defendant is incorrect in asserting that all persons who had moral or religious scruples against the death penalty were excluded from the instant jury. As shown by the quoted question, those excluded were people who had such scruples as would prevent them from *considering* the death penalty. Witherspoon and Boulden do not support defendant's contention. Those cases hold that it was error to exclude veniremen simply because they expressed general objections to the death penalty. It is clearly indicated that they do not strike down the practice of excluding veniremen who say that they will not consider that penalty. We have heretofore ruled that such exclusion is proper. See State v. Pollard, Mo.Sup., 447 S.W.2d 249, and Duisen v. State, Mo.Sup., 441 S.W.2d 688. This contention is accordingly ruled against defendant.

■ The next point briefed is that defendant was deprived of a fair trial because

of inflammatory publicity both before and during trial and therefore the trial court erred in not granting a new trial. This contention is devoid of merit. If the publicity prior to trial so inflamed the people that defendant could not get a fair trial he could and should have obtained a change of venue. As to the publicity during trial there is no proof or even a suggestion that the jury was aware of it. The jury was properly qualified and kept in the custody of officers during the trial. We can see no basis for ruling that any prejudicial error occurred. The cited case of Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600, is entirely distinguishable on the factual situation involved.

■ It is also contended that defendant should have been granted a new trial because the manner in which he was confined prior to trial, in various jails in the area and in the penitentiary, constituted cruel and unusual punishment. The only authority cited is the Eighth Amendment to the U. S. Constitution which prohibits cruel and unusual punishment. We are somewhat at a loss to understand why this contention is advanced as a ground for new trial. There is no suggestion that defendant did not have full opportunity to consult with his attorney and make complete preparation for trial. When the case was called he answered ready for trial. There is no contention that said alleged mistreatment affected any of defendant's trial decisions or had any effect on the trial itself. It therefore clearly appears that said contention would not afford any possible basis for granting a new trial.

The next point we will consider is that "the court erred in giving Instructions 1, 2, 3, 4, and 5 because when read together the same are misleading, confusing, and conflicting and constitute erroneous and prejudicial misdirection." Number 1 is a short instruction relating to the general duty of jurors. Number 2 is an instruction on presumption of innocence and reasonable doubt. Number 3 is the felony-murder instruction under which defendant was con-

victed. Number 4 directs a verdict of not guilty of murder upon a finding that the fire was caused by accident. Instruction No. 5, upon a finding of not guilty of murder, submits the offense of manslaughter by culpable negligence. Defendant concedes that "all of the instructions which are set forth under this point have apparently at one time or another been approved by this Court." He then makes a general attack upon the type of instructions we have approved through the years in criminal cases. He says they are too long, conflicting, confusing, and use words that are difficult to understand. Although we do not think the instructions now in use have resulted in injustice, we agree that it would be desirable to have simplified approved instructions and we take notice of the fact that a committee of the Missouri Bar is presently working on such a project.

■ Defendant has made a number of specific objections to the various instructions which we will briefly consider. Number 1 is complained of because it tells the jury that it shall determine the facts from "all the facts and circumstances in the case." It is suggested that the jury would not understand what *circumstances* it could consider. We think the jury reasonably would have considered the quoted phrase to mean "facts and circumstances given in evidence," as was specifically included in the credibility of witnesses instruction. In No. 2 it is said that conflicting standards are given in telling the jury that the presumption of innocence continues "until it has been overcome by evidence which establishes his guilt to your satisfaction and beyond a reasonable doubt." It is said that use of the word "satisfaction" permits application of a subjective standard. We see no error. The essential requirement is a finding of guilt beyond a reasonable doubt. That is included in the instruction along with the additional conjunctive requirement that the evidence established guilt to the satisfaction of the jury. Complaint is also made of the admonition that "a doubt to authorize an acquittal on that ground ought to be a

substantial doubt touching the defendant's guilt." It is suggested that use of the word "ought" makes the phrase difficult to understand. We think any juror would reasonably understand that "ought to" as so used would mean "should" and that no error resulted in that regard. The identical instruction was approved in State v. Mooring, Mo.Sup., 445 S.W.2d 303.

The first complaint regarding No. 3 is that the word "unlawfully" was not defined. This word is in common usage and we have frequently held that it need not be defined. See State v. Tull, Mo.Sup., 375 S.W.2d 100. Defendant next says that the instruction erroneously failed to use the words of the arson statute. We do not agree. The arson statute in question, § 560.025, uses the phrase "willfully set fire to, burn or cause to be burned." No. 3 required a finding that defendant "willfully, unlawfully, and feloniously did set fire to and cause to be burned * * *." It followed substantially the words of the statute. Objection is also made to the statement that "it is not necessary to a guilty verdict that the defendant, William Coleman, at the time he set the fire, if you find he did set it, intended to kill Geraldine Settle." It is contended that the jury might have considered that intent was not an element of the overall crime. We rule that the jury, with the entire instruction before it, could not reasonably have so construed that portion of the instruction. It is also stated that No. 3 was erroneous because it used the word "feloniously." That contention is so obviously without merit that it may be overruled without discussion. The final complaint as to No. 3 is that it was "defective in that it failed to hypothesize the actual facts upon which the State rested its case, i. e., the act of striking a match and throwing it into the gasoline." No case is cited in either brief upon this point. We think, however, that no authority is needed to support a ruling that such facts need not have been hypothesized. There was no contention about the fact that the seriousness of the fire resulted from the gasoline

that defendant had taken into the tavern and that it was ignited by a match. The disputed issue concerned the person who lit and threw the match. That was covered by the required finding that defendant set the fire.

Defendant complains of No. 4 because it uses in one instruction the words "murder, accident, misadventure, excusable homicide, and culpable negligence." For many reasons (without citation of authority) he says the instruction is totally confusing. We do not agree. The instruction tells the jury that if it finds the fire was of accidental origin defendant should be acquitted. It defines accident and excusable homicide and states that an accidental killing is not excusable if it results from culpable negligence. Further, that "the burden of proof is not upon the defendant to prove that the fire mentioned in evidence was caused by accident, but the burden of proof is upon the State to show by credible evidence, beyond a reasonable doubt, that said fire was intentionally set by the defendant, and that the fire did not occur by accident." We see no prejudicial error in the instruction.

In No. 5 the submission was manslaughter by culpable negligence and it was so worded that the jury should not have considered it unless it found defendant not guilty of murder. We have said that "there can ordinarily be no reversible error in the giving of a manslaughter instruction where the jury has found defendant guilty of first or second degree murder." State v. Davis, Mo.Sup., 400 S.W.2d 141, 151. We will nevertheless review the contentions relating to No. 5. It is first said that it is confusing because it says that "reasonable doubt" is defined in "these instructions" when it is not so defined. We note that there is the phrase in No. 2 which says that a reasonable doubt "to authorize an acquittal on that ground ought to be a substantial doubt touching the defendant's guilt and not a mere possibility of his innocence." In State v. Drake, Mo.Sup., 298 S.W.2d 374, this

court held that the quoted definition was sufficient. The remaining complaint as to No. 5 is that because the word "feloniously" is used to modify the proscribed act in it, as well as in No. 3, the jury would not understand the difference between the two submissions. We rule this point against defendant by simply saying that we cannot believe that a jury reasonably could have had that difficulty.

■ The next point briefed is that the court erred in submitting to the jury the question of whether defendant, if found guilty, should have his punishment assessed at death or life imprisonment without any standards or directions to guide the jury in making that decision. He says that "this procedure violates the Fourteenth Amendment of the Constitution of the United States in two respects: First, the absence of a procedure outlining the method by which a jury shall determine the question as to whether a particular accused is fit to live deprives the appellant of his life without due process of law. Second, the absence of standards or directions permits the jury to arbitrarily and capriciously impose the death penalty upon certain types of defendants such as the poor, the indigent, black or any other person socially unacceptable to the particular twelve jurors and at the same time permit the imposition of the lesser punishment of life imprisonment with his prospect of parole and release to those found by the particular twelve jurors to be more personally or socially acceptable to them." We ruled a similar contention recently in Duisen v. State, Mo.Sup., 441 S.W.2d 688, as follows: "Many years ago the legislative branch declared the policy of this state to be that for the offense of first degree murder the punishment shall be either life imprisonment or death. That policy entrusts absolute discretion in a jury to make the decision whether the punishment assessed shall be one or the other, without standards or rules to guide the jury in making that decision. This policy has been in effect well over a century. Movant contends that this discretion should be limit-

ed, directed and controlled by uniform standards. We doubt the wisdom of prescribing standards in this area of criminal jurisprudence. Movant asserts that because standards (unarticulated by him) were not available to guide and direct the jury in making the decision in this case, its assessment of the death penalty violates his constitutional rights and that the law authorizing imposition of the alternative punishments is unconstitutional because violative of the equal protection and due process clauses of the Fourteenth Amendment to the Constitution of the United States. It does not follow that because the law entrusts this discretion to a jury without standards to direct and control its choice between the alternative punishments renders the law unconstitutional. We hold that the law is not unconstitutional and that movant's rights were not violated." 441 S.W.2d 1. c. 692. To like effect, see also State v. Smith, 74 Wash.2d 744, 446 P.2d 571 [43, 44].

The point that our procedure permits a jury to arbitrarily impose the death penalty on members of certain minority groups and the poor more often than upon other people cannot be sustained. In the first place, there is no evidence to support that assertion. Even if we assume that there is factual support for the contention that a larger percentage of some groups receive the death penalty than others it does not establish that juries act arbitrarily and capriciously in arriving at that penalty. The decision to assess the death penalty is certain to be a most unpleasant duty for members of a jury and it is safe to assume that it is never done unless every juror is thoroughly convinced that nothing short of that would accomplish the ends of justice. We have the view that juries can be confidently trusted to exercise a wise discretion in determining when the death penalty should be imposed and that standards to guide the jurors are not necessary and would probably not be helpful. As indicated, we rule this point against defendant.

■ The final contention is that imposition of the death penalty constitutes

cruel and unusual punishment in violation of the Eighth Amendment of the U. S. Constitution. No authorities are cited by defendant in support of that contention. We considered this same contention in Duisen, supra, and ruled that the death penalty is neither cruel nor unusual; that "it has been imposed since the beginning of time. The framers of our federal and state constitutions recognized and contemplated that this sentence could and would be imposed." 441 S.W.2d 1. c. 693. This contention has also been ruled adversely to the defendants in State v. Smith, supra, and People v. Walcher, 42 Ill.2d 159, 246 N.E.2d 256. We rule that the punishment assessed in this case is not cruel or unusual in violation of the constitutional provision cited and hence this point is disallowed.

The judgment is affirmed.

All concur.