283 So.2d 476 (1973)
STATE of Louisiana, Appellee,
v.
Wilbert JONES, Appellant.
No. 53421.
Supreme Court of Louisiana.
September 24, 1973.
Warren J. Hebert, New Orleans, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., LeRoy A. Hartley, Sp. Counsel to Atty. Gen., Ossie Brown, Dist. Atty., Nathan E. Wilson, Asst. Dist. Atty., for plaintiff-appellee.
TATE, Justice.
The defendant Jones was convicted of aggravated rape, La.R.S. 14:42, and sentenced to life imprisonment. On his appeal, he relies primarly upon four bills of *477 exceptions. We find merit in two of them and reverse.
Bill of Exceptions No. 2
During his opening statement to the jury, the assistant district attorney made the following comment:
"* * * I might indicate, while she [the rape victim] was driving around, the individual, Wilbert Jones, the accused in this instance, related to her something about white people having been taking advantage of the colored people and, of course, he wanted to get even with the white people * * *."
The defendant reserved this bill when the trial court overruled his objection to this statement as a prohibited reference to race.
Under Louisiana law, a mistrial is mandatory when a prosecutor refers "directly or indirectly" to race or color, where "the remark or comment is not material and not relevant and might create prejudice against the defendant in the mind of the jury." La.C.Cr.P. Art. 770(1).[1]
The statement in question was clearly of an effect to prejudice the white jury against this black defendant. It was not material or relevant, La.R.S. 15:441, to prove any of the essential elements of aggravated rape, La.R.S. 14:40, 14:42, nor to explain a relevant fact in connection with such proof. Further, as the state admits and as the transcript of evidence shows, the victim did not testify at the trial that the defendant told her he wanted to get even with the white peoplethat is, the statement of the district attorney appealing to racial prejudice was incorrect and was not supported by evidence introduced at the trial.
In the recent case of State v. Kaufman, 278 So.2d 86, 98 (La.Sup.Ct.1973), we cited an unbroken line of decisions in support of our statement that:
"The purpose of this mandatory prohibition of our 1966 code is to avoid the use of racial prejudice to obtain convictions. This is in accord with our jurisprudence since our earliest days as an American jurisdiction. It is, of course, founded upon a stringent requirement that trials be conducted in accordance with law and that convictions be founded on evidence of guilt and not upon prejudice. Without this mandatory rule of law, the convictions of innocent defendants may be secured, not because of their guilt, but because of their race."
For similar reasons we here find reversible error in a violation of this mandatory prohibition of our Code of Criminal Procedure against prosecutorial comments which, without legal excuse, directly or indirectly appeal to racial prejudice.
Bill of Exceptions No. 6
After evidence was taken that the defendant had been properly identified by the victim at a line-up, one of the police officers was asked to identify pictures of the defendant the night he was arrested. These were "mug shots" showing frontal and side views of the defendant standing before a screen containing ruled lines and numerals indicating the height of the person being photographed. Inserts at the bottom of the photographs indicate the *478 date (1-14-72) and an identifying number (E.B.R.S.O.-102182). The defendant is shown wearing an unpressed, ill-fitting, open color shirt commonly referred to as "jail clothes".
The defendant reserved this bill when his objection was overruled to the admission of these pictures as irrelevant and prejudicial. These pictures were allegedly introduced to show the defendant's hair condition on the night he was arrested, three months after the rape, and his height. Other evidence to prove these marginally relevant points had been admitted and was available. Under the circumstances, the mug shots (which connote a criminal record and create a prejudicial effect upon a jury) were not admissible for this purpose, for their prejudicial effect far outweighed their probative value.
See, e.g.: State v. Hatcher, 277 N.C. 380, 177 S.E.2d 892 (1970); Blue v. State, 235 N.E.2d 471, 30 A.L.R.3d 902, 907 (Indiana Sup.Ct.1968); Barnes v. United States, 124 U.S.App.D.C. 318, 365 F.2d 509 (1966); Annotation, Mug ShotsAdmissibilityPrejudice, 30 A.L.R.3d 908 (1970); 29 Am.Jur.2d "Evidence", Section 785 (1967).

Decree
For the foregoing reasons, the conviction and sentence are reversed, and the case is remanded for a new trial.
Reversed and remanded.
SANDERS, C. J., dissents with written reasons.
SUMMERS, J., dissents with written reasons.
MARCUS, J., dissents.
SANDERS, Chief Justice (dissenting).
The majority reverses the conviction because of a reference to race in the District Attorney's opening statement and the introduction of photographs of the defendant made on the night of his arrest. I disagree.
Under Article 770 of the Louisiana Code of Criminal Procedure, a reference to race by the District Attorney is a ground for a mistrial only when the "comment is not material and relevant and might create prejudice against the defendant in the mind of the jury."
Both the defendant and the victim are of the black race. The victim is of very light complexion and could easily be mistaken for a member of the white race.
A review of the evidence shows that after the defendant forced the victim into her automobile that he made remarks concerning race, stating among other things, "You are white and I am black." For identification, the victim attended a lineup and each person in the line was required to state, "You are white and I am black." Hence, the evidence was relevant, because it formed part of the res gestae and explained how the identification was made.
The trial judge, of course, instructed the jury that statements made by the District Attorney were not evidence.
I am of the opinion that the ruling of the trial judge was correct.
I am also of the opinion that the photographs were properly admitted. They were made at the time of the arrest and were introduced to show the height and hair of the defendant at the time of the lineup, the subject of identification testimony.
The introduction of the pictures, at most, disclosed that defendant had been arrested for the rape. This, the jury already knew.
The jurisprudence supports the admission of the photographs. See State v. Hall, 261 La. 777, 260 So.2d 913 (1972); State v. Harris, 258 La. 720, 247 So.2d 847 (1971); State v. Hopper, 251 La. 77, 203 So.2d 222 (1967) judg. vacated on other *479 grounds, 392 U.S. 658, 88 S.Ct. 2281, 20 L. Ed.2d 1347 (1968); State v. Hughes, 244 La. 774, 154 So.2d 395 (1963); State v. Pollard, Mo., 447 S.W.2d 249 (1969).
For the reasons assigned, I respectfully dissent.
SUMMERS, Justice (dissenting).
Finding that a remark of the assistant district attorney in his opening statement, referring to utterances by the accused during commission of the crime concerning white people and colored people, was "not material and not relevant and might create prejudice against the defendant," the majority finds Bill of Exceptions No. 2 to have merit. Accordingly the majority, on this conjecture and speculation, assigns this finding as one basis for reversing this conviction for aggravated rape. This finding is based upon the conclusion that "the victim did not testify at the trial that defendant told her he wanted to get even with the white peoplethat is, the statement of the district attorney appealing to racial prejudice was incorrect and was not supported by evidence introduced at the trial."
At eleven o'clock at night the victim was getting out of her car in a hospital parking lot to go to work at the hospital when the defendant Jones came up to her, pushed her back into the car, and told her to "shut up, get in and drive." Defendant got into the back of the car, and, as he did so, a gun in his hand discharged, the bullet penetrating the front car window on the passenger side. Thereafter, as related by the victim in answer to the district attorney's question, "Now, after this, what happened then?" this occurred:
"Well, he got in back of the car and he told me to drive and I told him that I wasn't white, that I was a Negro, and he said, no, you're white and I'm black, and he had me drive around, you know, saying, turn here, turn there, at different corners."
After forcing the victim to drive to an isolated spot in the rear of a public building, he commanded her to undress, shaking the pistol at her until she finally disrobed. Jones then forced her into an act of sexual intercourse; he raped her. When it was over, while he was deliberating what to do with her, she begged him not to hurt her, pleading that she was a "Negro". Disregarding her pleas, he walked back to her car, inspected her driver's license and saw that she was in fact a Negro. He then said he was sorry. This is her testimony:
"Well, I was begging him all the while not to hurt me, and he said that he hadn't made up his mind, he didn't know what to do with me, and I kept telling him I was a Negro, and hewhen we walked back to the car, he looked at my driver's license and when he saw that I was a Negro, he said he was sorry, and then he drove around...."
The victim was forced back into the car; this time Jones took the driver's seat. After driving around for about 15 or 20 minutes he returned to the same spot where the first rape occurred and he sexually assaulted her the second time. Thereafter they entered the car and drove around until he decided to leave her, threatening her not to tell anyone what had occurred. Notwithstanding, the victim, who was a nurse, drove directly to the hospital where she worked, and reported the incident to the superintendent. The police were summoned, and an investigation ensued.
At a lineup later at which the victim identified the accused, the victim was asked:
"Q.... could you describe the lineup that you attended when you identified the accused in this case? What took place at the lineup?
A. They all saidthey all spoke, and they all showed their teeth, upper and lower teeth. (The victim had described her assailant as having a space between his front teeth and *480 as having said "You're white, I'm black.") (parentheses added).
Q. Do you recall what they said?
A. No"You're white, I'm black," and "I don't know what to do with you, I haven't made up my mind yet," and they also said, "shut up, get in and drive."
Q. Now, when you identified him, did you make a voice identification of him, also?
A. I said that his voice sounded different from the night of the rape.
Q. Now, did the individual that raped you, did he pronounce any words peculiarly, in any way?
A. He said, "I don't know what to" when he said, "I don't know what to do with you", he pronouncedhe said, "I don't know what to do wit" choo".
Q. Now, at the lineup, did this accused pronounce that in the same fashion?
A. Yes.
Q. ... another thing, do you know what brought on the discussion as far as race?
A. I just thought that maybe, when he pushed his way into the car, if he knew I was colored, he wouldn't bother me.
Q. Well, what was his response to it, when you first mentioned it?
A. He said, no, you white, I'm black.
Q. Any any other time, at any other time, either during the rape or after, did he say anything in this respect?
A. I kept telling him and he passed his hand over my hair and said, you could pass for white."
Detective Aaron Johnson of the Baton Rouge City police was testifying at the trial concerning his participation at the lineup at which the victim identified the defendant Jones; he related that Jones was permitted to select 4 or 5 participants for the lineup from inmates in jail who he determined resembled him or "fit his description." Each person in the lineup made the same statement, words used by Jones during the events leading to, during and subsequent to the actual rape. The sergeant who gave the commands, asked each person in the lineup to say: "get in", "shut up", "shut up and drive", "you're white and I'm black", and "I haven't made my mind up."
Detective Alvin Mack also testified about the lineup, recalling the words the suspects in the lineup were told to repeat. His testimony:
"A. Each suspect was commanded to step forward, turn to the rear, turn to the right, turn to the left, and each was commanded to say some of the statements that had been said to the victim on the night of the alleged rape.
Q. Do you recall what those statements were?
A. Yes, they were advised to say, "get in, shut up and drive", "you are white and I am black," "I haven't made my mind up," "I don't know what to do with you."
In my view the evidence introduced at the trial was relevant and material to the prosecution. Although the statement of the prosecuting attorney was not fully affirmed as an exact quote, the evidence did corroborate his statement in substance, and his statement was a fair representation of what the State proposed to prove, and did in fact prove. Statements concerning race referred to by the prosecutor were actually uttered by the defendant, they were pertinent to the vital issue of identification and, in effect, evidenced, in part, the defendant's *481 motive prompting the commission of the crime.
The majority's statement, upon which the author of the opinion apparently relies to a considerable extent, that the victim did not testify at the trial that the defendant told her he wanted to get even with white people is technically correct in that the precise words used by the district attorney were not shown to be used by the defendant. Otherwise, however, the majority's statement is erroneous for the substance of what the district attorney said was proven at the trial. The reasonable, logical common sense implication and clear inference, indeed the explicit meaning, to be derived from the words used by defendant and his conversation with the victim in the context in which they were used is the very conclusion the prosecuting attorney drew from them in his opening statement.
This rapist was not convicted because of racial prejudice; the victim herself was a Negro. Jones was convicted because he was positively identified when he appeared for the first time in the fifth lineup to which the victim had been called. He was convicted because he did in fact commit rape.
The majority also rules that Bill of Exceptions No. 6 has merit. The ruling is based upon the finding that mug shots introduced in evidence were irrelevant and prejudicial. A reading of the testimony refutes this conclusion. By questioning the prosecuting witness, defense counsel elicited from her the fact that during the commission of the crime, and later at the line-up, the defendant's hair was differently cut. She testified her assailant wore a moderate Afro hair style and that he was a bit taller than she or about the same height. Defense counsel then had defendant stand in court and asked the witness if she remembered her assailant being defendant's height. She stated she did not understand the question, and he explained:
Well, ... I'm trying to make sure of your identification. That's all I'm trying to do, and you testified in response to an earlier question that the man that you described to the police as a little bit taller than you, and you said that you are about 5'5", is that right? I am trying to point out to you that this man is much shorter than that ...
The mug shots were later introduced by the State for the purpose of showing the height of this accused, and the fact that he had a moderate Afro haircut at the time of his arrest. The picture corroborated the fact that he did have such a haircut, and it also corroborated the fact that the defendant was 5'7", "a little bit taller" than the victim who was 5'5".
Identification of the defendant by the victim was crucial and the vital state evidence. The defense was trying to discredit her testimony, and it was extremely relevant for the State to show that her testimony on that fact issue was truthful and accurate.
Furthermore, when the mug shot was introduced, Officer Johnson testified that it was made on the night defendant was arrested for this crime. Thus, the introduction of the mug shots is not controlled by the rule of law relied upon by the majority. As stated in 30 A.L.R. 3rd 911 the rule recites: "The fundamental reason why `rogues' gallery' photographs of a defendant may be inadmissible in a criminal trial is, of course, that they tend to apprise the jury of the fact that the defendant has been in some sort of trouble with the police before, thereby reflecting unfavorably upon the accused's character...."
Introduction of this mug shot with the qualifying predicate of Officer Johnson that it was made at the time of the arrest for the crime for which defendant was being tried could not have the effect of apprising the jury of the fact that "defendant has been in some sort of trouble with the police before." Clearly, then, the "fundamental *482 reason" for the rule excluding mug shots was not satisfied here, and there is no merit to this Court's ruling upsetting this rape conviction.
I dissent.
NOTES
[1] The full text of the mandatory provision of Article 770 in this regard is:

"Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
"(1) Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury; * * *
"An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, request that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial." (Italics ours.)