NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

12-1023

STATE OF LOUISIANA

VERSUS

JEREMY BROWN

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTY-THIRD JUDICIAL DISTRICT COURT
PARISH OF ALLEN, NO. CR2008-2335
HONORABLE JOEL GERARD DAVIS, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**BILLY HOWARD EZELL
JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Billy Howard Ezell, and Shannon J. Gremillion, Judges.

**AFFIRMED.**

**Edward John Marquet
Post Office Box 53733
Lafayette, LA 70505-3733
(337) 237-6841
COUNSEL FOR DEFENDANT/APPELLANT:**
	Jeremy Brown

**Herbert Todd Nesom**
**District Attorney, Thirty-Third Judicial District Court**
**Joe Green**
**Assistant District Attorney, Thirty-Third Judicial District Court**
**P. O. Box 839**
**Oberlin, LA 70655**
**(337) 639-2641**
**COUNSEL FOR APPELLEE:**
  **State of Louisiana**

**EZELL, Judge.**

Defendant, Jeremy Brown, was indicted on August 27, 2008, on two counts of first degree murder, violations of La.R.S. 14:30, one count of theft over $1,000, a violation of La.R.S. 14:67, and one count of obstruction of justice, a violation of La.R.S. 14:130.1. Defendant filed a "Motion to Suppress" on June 22, 2011. On July 18, 2011, the State filed a "Notice of Intent to Use Evidence of Other Crimes, Wrongs or Acts." A hearing was scheduled for August 10, 2011, following which the trial court ruled that the evidence of the prior crimes was not admissible. On September 1, 2011, the State filed a "Notice of Intent to Apply for Supervisory Writs." On November 3, 2011, this court reversed the trial court's ruling. *State v. Brown,* an unpublished writ bearing docket number 11-1225 (La.App. 3 Cir. 11/3/11), *writ denied*, 11-2492 (La. 2/3/12) 79 So.3d 328. On May 8, 2012, the trial court denied Defendant's "Motion to Suppress" in open court.

A jury trial commenced on May 21, 2012, and on May 25, 2012, Defendant was found guilty on all counts. On May 31, 2012, Defendant filed a "Motion for Judgment of Acquittal" and a "Motion for New Trial." These two motions were denied by the trial court prior to the sentencing hearing on June 26, 2012.

Defendant was sentenced to life imprisonment without the benefit of parole, probation, or suspension of sentences on the two convictions for first degree murder. He was also sentenced to ten years at hard labor on each of the theft and the obstruction convictions. All the sentences were ordered to be served concurrently.

Defendant has perfected a timely appeal. He alleges three assignments of error, as follows:

> 1. The trial court erred in denying defendant's Motion for Mistrial based on the prosecutor's repeated reference in closing argument that the

defendant wanted to "throw the black man under the bus. Not the white guy who did it. Let's throw the black man under the bus".

2. *State v Prieur* and its progeny required that the other crimes evidence of the defendant's prior Manslaughter conviction not be admitted into evidence during Stat's [sic] case-in-chief.

3. There existed insufficient evidence to support the defendant's convictions.

For all of the following reasons, Defendant's convictions are affirmed.

## FACTS

Between Tuesday night, June 17, and Wednesday morning, June 18, 2008, Defendant bludgeoned his sixty-seven-year-old mother and seventy-nine-year-old stepfather to death in their house. He then took items out of the house that would intend to incriminate him in the crimes, put them in the trunk of the victims' car, and attempted to sell the car two days later.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find there are no errors patent.

## ASSIGNMENT OF ERROR NUMBER THREE

For his third assignment of error, Defendant alleges that the evidence was insufficient to support the verdicts of first degree murders, theft, and obstruction of justice. We will address Defendant's third assignment of error first because if there is merit to this assignment, he would be entitled to an acquittal of the convictions for first degree murder and may be entitled to an acquittal of the remaining convictions. *Hudson v. Louisiana*, 450 U.S. 40, 101 S.Ct. 970 (1981). In this assignment, Defendant argues that there were no eyewitnesses or any other physical evidence to connect him to the crimes, that the convictions were based solely on circumstantial

2

evidence, and that the circumstantial evidence did not refute the reasonable hypothesis that other persons committed the crimes.

When sufficiency of the evidence is raised on appeal, this court has held:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559, at 563 (La.1983); State *v. Duncan,* 420 So.2d 1105 (La.1982); *State v. Moody,* 393 So.2d 1212 (La.1981). The role of the factfinder is to weigh the respective credibility of each witness. Therefore, the appellate court should not second guess the credibility determinations of the factfinder beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559, citing *State v. Richardson,* 425 So.2d 1228 (La.1983).

*State v. Miller,* 98-1873, p. 5 (La.App. 3 Cir. 10/13/99), 746 So.2d 118, 120, *writ denied*, 99-3259 (La. 5/5/00), 761 So.2d 541.

"Circumstantial evidence consists of proof of collateral facts and circumstances from which elemental factors may be inferred according to reason, experience and common sense." *State v. Burns,* 441 So.2d 843, 845 (La.App. 3 Cir. 1983). In *State v. Johnson*, 09-231, p. 6 (La.App. 3 Cir. 11/4/09), 21 So.3d 1159, 1164, *writ denied*, 09-2643 (La. 5/21/10), 36 So.3d 230 (quoting *State v. Chism,* 436 So.2d 464, 469 (La.1983)), this court held:

> The statutory rule in evaluating the sufficiency of circumstantial evidence is, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La.R.S. 15:438. The Louisiana Supreme Court has explained the "hypothesis of innocence" as follows:
>
> > Consequently, before a trier of fact can decide the ultimate question of whether a reasonable hypothesis of innocence exists in a criminal case based crucially on circumstantial evidence, a number of preliminary findings must be made. In addition to assessing the circumstantial evidence in light of the direct evidence, and vice versa, the trier of fact must decide what reasonable inferences may be

3

drawn from the circumstantial evidence, the manner in which competing inferences should be resolved, reconciled or compromised; and the weight and effect to be given to each permissible inference. From facts found from direct evidence and inferred from circumstantial evidence, the trier of fact should proceed, keeping in mind the relative strength and weakness of each inference and finding, to decide the ultimate question of whether this body of preliminary facts excludes every reasonable hypothesis of innocence.

In pertinent part, first degree murder is defined as the killing of a human being:

(3) When the offender has a specific intent to kill or to inflict great bodily harm upon more than one person.

. . . .

(5) When the offender has the specific intent to kill or to inflict great bodily harm upon a victim who is under the age of twelve or sixty-five years of age or older.

La.R.S. 14:30(A).

Theft is defined as "the misappropriation or taking of anything of value which belongs to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations. An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential." La.R.S. 14:67.

The obstruction statute, in pertinent part, provides:

A. The crime of obstruction of justice is any of the following when committed with the knowledge that such act has, reasonably may, or will affect an actual or potential present, past, or future criminal proceeding as hereinafter described:

(1) Tampering with evidence with the specific intent of distorting the results of any criminal investigation or proceeding which may reasonably prove relevant to a criminal investigation or proceeding. Tampering with evidence shall include the intentional alteration, movement, removal, or addition of any object or substance either:

(a) At the location of any incident which the perpetrator knows or has good reason to believe will be the subject of any investigation by state, local, or United States law enforcement officers; or

4

(b) At the location of storage, transfer, or place of review of any such evidence.

La.R.S. 14:130.1.

While Defendant is correct in that there was no eyewitness to the crime, the following facts were established at trial:

Defendant had moved in with his mother, Gretta Ellzey, and stepfather, Benjamin Ellzey, in Oakdale, Louisiana, shortly after being released from prison in April or May 2008. The Ellzeys were last seen alive by Mrs. Ellzey's son, Joey Maddox, and her daughter-in-law, Darlene Maddox, on Father's Day, June 15, 2008. For Father's Day, the Maddoxes gave Mr. Ellzey a new wallet and a one hundred dollar bill. Mrs. Maddox called Mrs. Ellzey on the following Tuesday. Mrs. Ellzey told her that she was expecting a home health care nurse to see her husband, who had recently been sent home from a nursing facility, the next day. Mrs. Maddox called her mother-in-law on Wednesday, but there was no answer. On Wednesday, Cathy Perry, a home health care worker, went to the Ellzeys' at the appointed time. No one answered the door when she knocked. Mrs. Ellzey's car was not in the carport. On Thursday, Mrs. Maddox called her mother-in-law again, and there was still no answer or call back. On Friday, after still no communication with the Ellzeys and a second missed home appointment with the healthcare nurse, the Maddoxes drove from their home in Ragley to Oakdale to investigate.

When the Maddoxes arrived at the Ellzey home in the late afternoon, no one answered the door and Mrs. Ellzey's car, a light blue Grand Marque, was not in the carport. The doors were locked so Mr. Maddox took the screen off a back bedroom window and crawled into the house. The two Ellzeys were located in Mr. Ellzey's

5

bedroom. Both were on the floor, covered with sheets and towels, surrounded by dried blood, and dead. Mrs. Ellzey was dressed only in underpants.

Notably missing from the house was the dryer. Mrs. Maddox testified that the washer and dryer were in the kitchen. When she entered the kitchen, she saw that there was a box of detergent dumped on the floor where the dryer had been next to the washing machine. Two house phones were also missing.

The Ellzeys' deaths were caused by blunt force trauma. The manner of death was determined to be homicide. Mr. Ellzey had an estimated thirty-four separate injuries of bone-deep lacerations to the face and body, contusions, abrasions, and five broken ribs on one side of his body and five on the other side of the chest area. Mrs. Ellzey had similar injuries, mostly bone-deep lacerations to the face. The bones of her cheeks and jaw were smashed. The autopsies were performed on Sunday, June 23, 2008. The bodies were discovered on Friday, June 21, 2008. The pathologist who performed the autopsies testified that the Ellzeys had been dead "greater" than one day prior to the discovery of their bodies. He further testified the injuries could have killed them in minutes, or it could have taken hours for them to die.

Defendant had started working at Gilchrist Construction on June 3, 2008. However, he failed to show up for work on Tuesday, June 17, and the days following. While there was testimony that Defendant was not permitted the use of Mrs. Ellzey's car, he was seen driving the car on Wednesday morning. John Moton, who was incarcerated at the time of trial for distribution of cocaine, testified that on Wednesday, Defendant came to his house in the victims' car with crack cocaine and told Mr. Moton he had two hundred dollars to purchase more cocaine. He said that they went to the bank together to withdraw money. However, he said that Defendant was extremely nervous and told him that "[t]hey might be looking for me." He was

also seen driving the car on Thursday. The Ellzey's next door neighbor, Tasha Ross, testified that she saw him back the car into the carport, then leave at about 3:00 p.m. On Thursday evening, Defendant showed up at the home of a family friend, Gregory Carrier, and attempted to sell him some frozen meat. He told Mr. Carrier his mother had no more room in the freezer. Mr. Carrier said that Defendant was acting very furtive, knocking on his window instead of coming to the front door, insisting that he turn off the porch light, and even crouching in the bushes.

Voories Leger and Roger Christian were both detectives with the Allen Parish Sheriff's Office at the time of the murders. They testified that they were concerned and suspicious of Defendant because he had been living with his parents but his whereabouts were unknown and the car was missing. They put the word out on the street and within a day were told that Defendant could be located at the home of John Moton. Upon arriving at Mr. Moton's house, the detectives saw Defendant rushing out of the house and down the street. When he was stopped, he gave the detectives a false name. After Defendant was taken to the police station, it was documented that he had cuts and scratches to his hands and arms.

The next day, Ben Perkins, a detective with the Allen Parish Sheriff's Office, received a phone call from Frank Thomas, who told him that Eric George had purchased a light blue Grand Marquis from Defendant on Friday, June 21, 2008. He told the detective where the car was located. Detectives Christian and Leger went to the location. Mr. Thomas and Mr. George showed up shortly after the detectives. Mr. George gave the car keys to the detectives. The car was identified as being Mrs. Ellzey's car.

Kevin Melbert testified that on Wednesday morning, he went over to John Moton's house to get some drugs. Defendant was there when he arrived. Defendant

asked him if he knew of anyone who wanted to buy a dryer. They loaded the dryer into Mr. Melbert's van and drove around for a while but found no one who wanted to purchase the dryer. Eventually, Defendant said Melbert could have the dryer, and they took the dryer to his house. The next day, Defendant showed up at his house and tried to sell him the car. He further stated that later, after Defendant received money for the car, they went back to his house and smoked cocaine.

Eric George testified that on Friday morning, he and Frank Thomas had gone to a convenience store where they were approached by Kevin Melbert. Mr. Melbert told them he had a friend who wanted to sell his car. Mr. George said he was interested, and they walked across the street to where the car was parked with Defendant waiting. Mr. George test-drove the car and said he wanted to buy it. Defendant asked four hundred dollars for the car. Mr. George wanted a bill of sale, so they went to a notary, Nathan Benjamin, who said he needed to see a title before he could prepare a bill of sale.

Defendant told them the title was in his mother's name and said he would go get the title signed off and return with it. A half-an-hour later, Defendant returned but said that he could not wake his mother up to have her sign off on the title. Mr. George gave him the four hundred dollars anyway and took possession of the car. Defendant took a bag out of the trunk which was later identified as being the overnight bag his mother used whenever she went to see her doctor in Alexandria. As Defendant retrieved the bag from the trunk, Mr. George saw a black trash bag and a bundle made from a sheet in the trunk. Defendant told him it was just trash, to toss the bags away. He then gave Mr. George a phone number and promised to return with the title the next day. When Mr. George tried to call Defendant later, the number was not a good number.

Frank Thomas' testimony corroborated Mr. George's testimony. Kevin Melbert's testimony also corroborated Mr. Thomas' and Mr. George's testimonies regarding the attempt to get a bill of sale for the car. Mr. Thomas further stated that once they got the car to Mr. George's house, Mr. George removed the bags from the trunk and placed them beside the car for disposal the next day. However, the next day the detectives arrived and took possession of the car and the bags.

Chris Oakes, a detective with the Allen Parish Sheriff's Office, was tasked with collecting and cataloguing the physical evidence in this case. Among other pieces of evidence that he collected, he stated that he found at the scene of the murder, in a pool of dried blood, bloody pieces of wood, or sticks, which were believed to have been used to cause several of the injuries to the victims. He said that in the pool of blood there was a void, like someone had picked up one of the sticks. He stated he later found a bloody piece of wood, like the pieces he found at the crime scene, in the trunk of the car. He photographed a partial bloody footprint. He located what appeared to be contents of a wallet near Mr. Ellzey's body. He stated he found an old wallet in one of the bags that were in the trunk of the car. When he examined the contents of the car, he located and collected blood samples from the driver's side of the car. Finally, he examined the contents of the black plastic bag and sheet bundle. There was clothing in the bag, including a bloody shirt with "Brown" inscribed on it and bloody "Faded Glory" brand shorts with "Brown" inscribed in the waistband. There were also two bloody house phones in the bag.

DNA analysis established that the blood on the two phones was Mrs. Ellzey's blood, as was the blood taken from the shirt. Blood on the shorts were both Mrs. Ellzey's and Defendant's blood. Further, the blood samples tested did not exclude

Mr. Ellzey as a contributor. The blood sample taken from the carport floor was Defendant's.

Finally, the jury heard testimony regarding Defendant's prior criminal history. He was convicted in 1990 of manslaughter. He was originally charged with second degree murder of his father, Lee Earl Brown. He shot his father in the back with a shotgun after they had had an argument. He then attempted to burn down the house to cover up the crime. Defendant's father had just received several hundred dollars, and the money was never located. Further, Defendant had been arrested in 2005 for theft. He had stolen money and credit cards from Mr. Ellzey's room at the nursing home after Mr. Ellzey refused to give him some money.

In brief, Defendant argues that several uncontroverted facts point to the insufficiency of the evidence. He argues that there was no evidence that he had any animosity or problems with the victims, that there was no forensic evidence found under the fingernails of the victims to connect him to the offenses, that there were no fingerprints connecting him to the offenses, that the bloody shoe print was not determined to have been made by any shoe of his, and that two other persons, who had criminal histories, were found to be in possession of the victims' property.

Most of the evidence was circumstantial. However, viewed in a light most favorable to the prosecution, the State proved all the elements of the first degree murder. DNA evidence linked Defendant to the crimes, the DNA of the victims and his own DNA, was found on the bloody clothing located in the trash bags in the trunk of the victims' car. Testimony established that the brutal attack took place late Tuesday night or early Wednesday morning. On Wednesday and the following two days, Defendant was seen driving the victims' car. On Thursday, he attempted to sell the dryer. On the third day, he attempted to sell the car. Furthermore, Defendant's

specific intent to either kill or inflict serious bodily damage was evident from the brutality of the attacks and the depth of the injuries. Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act[.]" La.R.S. 14:10(1). While specific intent is a question of fact, it may be inferred from the circumstances and from the actions of Defendant. *State v. Seals,* 09-1089 (La.App. 5 Cir. 12/29/11), 83 So.3d 285, *writ denied*, 12-293 (La. 10/26/12), 99 So.3d 53.

The jury obviously believed Mr. Thomas, Mr. George, and Mr. Melbert regarding how they came into possession of the victims' property. As noted above, "[t]he role of the factfinder is to weigh the respective credibility of each witness. Therefore, the appellate court should not second guess the credibility determinations of the factfinder beyond the sufficiency evaluations under the *Jackson* standard of review." *Miller*, 746 So.2d at 120. Defendant further exhibited a guilty mind when he attempted to evade the police by giving them a false name and trying to dispose of the bloody clothes and items.

While at trial and in brief, Defendant attempted to pin the murders on Eric George and Kevin Melbert, the evidence indicated, beyond a reasonable doubt, that Defendant knew his parents were lying dead or dying each and every time he entered the house, to get the dryer and to locate the title of the car. There were what appeared to be fresh defensive wounds on his hands or cuts from the victims' teeth. There were none on Mr. George's or Mr. Melbert's hands or arms.

In brief, Defendant does not discuss in what way the evidence of the convictions for theft and obstruction of justice were insufficient. Defendant attempted to sell the victims' dryer and accepted money for the victims' car, evidencing intent to

11

permanently deprive the victims of these. He also removed and disposed of incriminating evidence.

This assignment of error has no merit.

## ASSIGNMENT OF ERROR NUMBER ONE

Defendant asserts that the trial court erred when it denied his motion for a mistrial made following the State's closing argument. He argues that the State made several references to race in such a way as to prejudice two black jurors against him.

In pertinent part, La.Code Crim.P. art. 770 provides:

> Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
>
> (1) Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury[.]

During closing argument, the State said, "Counsel wants you to think that somebody else did it. Kevin Melbert did it. He's a hot head. Blame it on the black guy. It's not about the black guy. It's about the white guy this time." Later, the State said regarding Kevin Melbert's testimony, "He was mad at defendant for throwing him under the bus. Throw the black man under the bus. That's what this is about. Throw the black man under the bus. Not the white guy who did it. Let's throw the black man under the bus." Following the State's closing argument, Defendant moved for a mistrial. When the trial court denied the motion, Defendant objected to the ruling and noted for the record that two of the jurors were black. Defendant filed a "Motion for New Trial," wherein he alleged the above comments "were racial in nature and designed to appeal to the racial prejudices of the jury."

In *State v. Dixon*, 42,594, pp. 16-17 (La.App. 2 Cir. 1/16/08), 974 So.2d 793, 803-04, *writ denied,* 08-711 (La. 10/10/08), 993 So.2d 1282, *cert. denied,* 77 U.S. 3574, 129 S.Ct. 1989 (2009) (quoting *State v. Wilson*, 404 So.2d 968, 970 (La.1981)) (alteration in original), the second circuit noted:

> When the alleged criminal conduct arises out of an incident among persons filled with racial animosity our system of criminal justice requires that those charged with the responsibility for the conduct of criminal trials strictly avoid any actions which might influence the jury to decide the guilt or innocence of the accused upon prejudice rather than on the law and the evidence. We set forth our views at length in *State v. Jones*, [283 So.2d 476 (La.1973)], wherein we stated that racial remarks are not permissible if they appeal to racial prejudice and are not relevant either to prove the elements of the crime or to explain a relevant fact.
>
> Even so, not every reference to race requires the granting of a mistrial. *State v. King,* 573 So.2d 604 (La.App. 2d Cir.1991), citing *State v. Jenkins,* 340 So.2d 157 (La.1976). To require a mistrial the remark must be immaterial and irrelevant and must be such that it might create prejudice against the defendant in the mind of the jury.

In *Dixon*, two men robbed at gunpoint two other men who were carrying a large amount of payroll money. One of the robbers shot and killed one of the victims. Another man, who drove the two robbers to a location where they committed the robbery and then picked them up after the robbery, testified for the state at the trial. During closing arguments, the prosecutor discussed the get-away driver's testimony. The prosecutor stated: "Mr. Green said first of all—I don't know how old Mr. Green is. But you all saw him. He's a young black man. Young black men can tend to be very volatile. Y'all heard Mr. Perkins (defense counsel) who is a white man—" *Id.* at 803. At this point defense counsel asked for a mistrial, which was denied. The second circuit concluded:

> In the present case, the prosecutor, who was also black, made a general comment in the closing argument that the witness, who had participated in this crime and was testifying for the state, was young,

black, and could be volatile when aggressively cross-examined by a white defense attorney. During cross-examination, the defense attorney repeatedly called the witness a liar. The prosecutor's references to the race of the witness were unnecessary and a poor choice of words; however, the reference to race was to support the witness's believability and was not an appeal to racial prejudice.

The present case does not involve a crime arising out of racial conflict nor did the prosecutor appeal for racial prejudice against the defendant. Thus, the facts in the case *sub judice* are distinguishable from the facts in *State v. Wilson*, *supra*. Accordingly, the trial court properly denied defendant's motion for mistrial because it did not satisfy the requirements of La. C. Cr. P. art. 770(1). This assignment is therefore without merit.

*Id.* at 804.

In the current case, during opening and closing arguments, the defense argued that the facts indicated Mr. Melbert and possibly Mr. George were responsible for the murders, primarily because they both were in possession of the victims' property at the time of the discovery of the bodies and that they both had criminal histories. He argued that because Defendant was small and weighed only one hundred and thirty pounds, he could not have removed the dryer from the house by himself. Furthermore, Mr. Melbert admitted that he had a violent criminal history, was addicted to crack cocaine, and had distributed the drug to Defendant; therefore, Defendant reasoned, the murders were a two-man affair. Both Mr. Melbert and Mr. George were black men.

In brief, the State argues that the term to "throw somebody under the bus" is a standard expression meaning to blame someone else for the offense or problem and had no racial meaning or overtone in the context of this case. The State further argues in brief that "[t]he words were a poor choice of identifiers used by the prosecutor in addressing the defendant and the witness who the defendant was trying to paint as culpable for the heinous acts committed. The prosecutor's use of these words was

meant to do nothing more than give the jury a precise understanding of defendant's strategy—that *this* defendant (Jeremy Brown) was attempting to throw *that* witness (Kevin Melbert) under the bus."

We agree that the prosecutor's choice of words was very inappropriate and, therefore, suspect as to the purpose. However, we also agree with the State's argument that because the death penalty was not being sought, it needed only ten of the twelve jurors to vote guilty for a conviction, thus indicating its intention was not to simply induce the two black jurors to vote guilty.

Furthermore,

> Even in the case of a prosecutor exceeding the bounds of proper argument, a reviewing court will not reverse a conviction unless thoroughly convinced that the argument influenced the jury and contributed to the verdict. *State v. Wiltz*, 2008-1441, p. 6 (La.App. 4 Cir. 12/16/09), 28 So.3d 554, 558, *writ denied,* 2010-0103 (La.11/12/10), 49 So.3d 885; *State v. Harvey*, 2008-0217, p. 4 (La.App. 4 Cir. 5/13/09), 12 So.3d 496, 499. Even where the prosecutor's statements are improper, a reviewing court should accord credit to the good sense and fair-mindedness of the jurors who heard the evidence. *Harvey, supra.*

*State v. Marlowe,* 10-1116, p. 66 (La.App. 4 Cir. 12/22/11), 81 So.3d 944, 982, *writ denied*, 12-231 (La. 5/18/12), 89 So.3d 1191.

In the current case, the jury was unanimous in its verdict and that was because the evidence was overwhelming that Defendant killed his parents. Even were this court to conclude that the remarks were improper comments on the race of the witnesses in this case and that a mistrial was warranted, the failure to grant a mistrial would not result in an automatic reversal of the conviction but would be a trial error and, as such, subject to the harmless error analysis on appeal. *State v. Whins*, 96-699 (La.App. 4 Cir. 4/9/97), 692 So.2d 1350, *writ denied*, 97-1227 (La. 11/7/97), 703 So.2d 1263. *See also* La.Code Crim.P. art. 921, which provides that "[a] judgment or ruling shall not be reversed by an appellate court because of any error, defect,

irregularity, or variance which does not affect substantial rights of the accused." Considering all of the evidence submitted, both direct and circumstantial, the jury's verdict was not influenced by the remarks made by the prosecutor during closing argument that Defendant was attempting to throw the black man under the bus. Accordingly, there is no merit to this assignment of error.

**ASSIGNMENT OF ERROR NUMBER TWO**

Defendant asserts that his fundamental right to a fair trial was violated when this court granted the State's writ of supervisory review, which allowed testimony regarding the manslaughter and theft convictions into evidence in the current trial.

On July 18, 2011, the State filed "Notice of Intent to Use Evidence of Other Crimes, Wrongs or Acts" notifying Defendant of its intent to use the manslaughter, arson, and theft convictions to establish identity in the case at issue. A hearing was held on August 10, 2011. Following arguments, the trial court ruled that the evidence of the prior crimes was not admissible. The State took a supervisory writ, and this court ruled:

> **WRIT GRANTED AND MADE PEREMPTORY:** The trial court abused its discretion in requiring the other crimes evidence intended to show motive to share the same *modus operandi* as the offenses with which Defendant is currently charged. The circumstances of the manslaughter and the corresponding arson conviction are similar enough to the instant case to show identity through *modus operandi*. The remaining other crimes/bad acts advanced by the State are admissible to prove motive.
>
> Additionally, the district court erred in ruling that, because it was prejudicial to the defense, the other crimes evidence was inadmissible. All relevant evidence introduced by the prosecution in criminal cases is prejudicial to the defense. The pertinent criteria for excluding relevant evidence for prejudice is whether the danger of unfair prejudice substantially outweighs the probative value of that evidence. Therefore, though it is prejudicial to the defense, the other crimes evidence in the instant case is not that which would lead the jury to convict Defendant solely because he is a bad man.

Accordingly, the district court's decision, insofar as it ruled the other crimes evidence inadmissible to show motive, is hereby reversed, and the case is remanded to the trial court for further proceedings in accordance with this ruling.

*State v. Brown*, an unpublished writ bearing docket number 11-1225 (La.App. 3 Cir. 11/3/11), *writ denied*, 11-2492 (La. 2/3/12), 79 So.3d 328.

However, the record before this court indicates that this court's ruling was made on the merits as presented, and nothing has been currently argued that would indicate that the ruling was erroneous. The Louisiana Supreme Court in *State v. Humphrey*, 412 So.2d 507, 523 (La.1981), held:

> When this court considers questions of admissibility of evidence in advance of trial by granting a pretrial application for supervisory writs (rather than deferring judgment until an appeal in the event of conviction), the determination of admissibility does not absolutely preclude a different decision on appeal, at which time the issues may have been more clearly framed by the evidence adduced at trial. Nevertheless, judicial efficiency demands that this court accord great deference to its pretrial decisions on admissibility, unless it is apparent, in light of the subsequent trial record, that the determination was patently erroneous and produced an unjust result.

*See also State v. Cash*, 03-853 (La.App. 3 Cir. 12/10/03), 861 So.2d 851, *writ denied,* 04-27 (La. 4/30/04), 872 So.2d 472, *writ denied*, 04-232 (La. 5/7/04), 872 So.2d 1080.

Accordingly, the law of the case doctrine applies.

**DECREE**

This court affirms the convictions for the first degree murders of Gretta Ellzey and Benjamin Ellzey, theft, and obstructions of justice.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION. Uniform Rules—Courts of Appeal. Rule 2-16.3.